Todd Olen Easterwood was indicted for first-degree sodomy. The indictment charged that Easterwood had engaged in deviate sexual intercourse with a child under the age of 12[1] by forcible compulsion, a violation of § 13A-6-63(a)(1), Ala. Code 1975. Following a trial, Easterwood was convicted and was sentenced to 22 years' imprisonment. Easterwood appealed, arguing, among other things, that the trial court committed reversible error by allegedly denying his Sixth Amendment right to a public trial under the United States Constitution. On June 23, 2006, the Court of Criminal Appeals, in an unpublished memorandum, affirmed Easterwood's conviction, holding that the trial court did not abuse its discretion in closing the courtroom because there was only a partial closure of the courtroom and such closure was necessary to obtain information of a sensitive nature from a witness. Easterwood v.State (No. CR-04-2205, June 23, 2006), 978 So.2d 74
(Ala.Crim.App. 2006) (table). Easterwood petitioned this Court for a writ of certiorari; we granted the petition to review the issue whether Easterwood's right to a public trial was violated when the trial court allowed Easterwood to have only one representative in the courtroom during the testimony of G.W.B.
The evidence introduced at trial tended to show that Easterwood, who was employed as a police officer by the City of Birmingham at the time of the incident, engaged in sexual misconduct with the victim beginning when the child was 11 or 12 years old. Initially, the conduct began as back rubs but progressed to kissing, masturbation, and eventually oral sex.
At trial, G.W.B., a 27-year-old convicted felon who was at the time of Easterwood's trial incarcerated on a robbery conviction, was called as a witness for the State. G.W.B. was to testify to a sexual relationship he had had with Easterwood, beginning when G.W.B. was 11 years old and Easterwood was 19 years old. The purpose of G.W.B.'s testimony was to establish motive for the charged offense, i.e., Easterwood's sexual desire for young boys.
Once he was on the witness stand and the questioning from the State turned to *Page 369 
the nature of his relationship with Easterwood, G.W.B. became reluctant to testify:
 "[Prosecutor]: And did you ever do anything other than listen to the radio and stuff like that?
 "[G.W.B.]: Sir, I don't think I'm — I don't know if I'm going to be able to do this. I mean, it's humiliating, and I don't know — I don't think I'm going to be able to do this.
 "[Prosecutor]: When you say `humiliating,' what do you mean by `humiliating'?
 "[G.W.B.]: I just — all of this is humiliating to me, and I just can't — I just can't do this right now.
 "[Prosecutor]: Okay. When you say" and let's — let's — talk about. Can you look at me? When you say that it's all humiliating, what kind of things were humiliating? The things that happened at the house, or what kind of things?
 "[G.W.B.]: Just being in this courtroom and, you know, all of this, you know.
 "[Prosecutor]: Talking about what happened?
 "[G.W.B.]: Yeah, just talking about it, you know, and all of this. You know, I don't want to do this.
 "[Prosecutor]: Okay. So, what you've got to talk about or what we've asked you to come here to talk about, is that humiliating to you to do it in front of other people?
 "[G.W.B.]: (Nods head)
 "[Prosecutor]: Would it make you feel more comfortable to testify if we asked some of these people to leave the courtroom? You understand the ladies and gentlemen sitting here right in front of you, they're the jury. They'll need to stay and listen to you; okay? But would it make you to feel more comfortable if we asked other people to step outside for a few minutes?
 "[G.W.B.]: I just — I'd — you know, I'd feel better if I could call and talk to my dad or something a little bit. I just" you know, this is just all coming up at one time, you know, it's —
 "[Prosecutor]: Okay. All right.
 "[G.W.B.]: I'd rather — you know, he's got all of his people in here. I ain't got my people, none of my family or nobody in here, you know. I just rather — I just want to talk to my dad?
 "[Prosecutor]: Your father is here. He's out in the hallway. Because he's a witness, he can't be in the courtroom. Would it make you feel better if you could have a few minutes to talk to your father?
 "[G.W.B.]: Please."
G.W.B. was given time by the trial court to speak with his father. In the meantime, the following colloquy occurred:
 "[Prosecutor]: Judge, [G.W.B.] was on the stand and had indicated a reluctance to talk about an embarrassing matter in front of . . . other people in the courtroom. We would ask that, due to the nature of the testimony and the impact upon this witness as he testifies, we would ask that spectators in the courtroom be asked to step outside during his examination so that he can feel more comfortable and can talk openly with the jury.
 "[The Court]: Okay.
 "[Defense counsel]: Judge, that's not what I heard him say. That was what was suggested to him, but he just said, `I just don't want to talk about it here in front of people.' I don't know whether he meant the jury or anybody else. It was suggested to him the other people in the courtroom, but the witness didn't say that. And obviously, we have open *Page 370 
courtrooms in this state. And the State has brought people in. I don't see what the relevance of the motion is.
 "[Prosecutor]: Well, I mean, let's talk about exactly what he did say. He said `he,' meaning the defendant, has all of his people in here looking at me, and I don't have anybody. So, yeah, he did make a reference to a specific set of people. And he doesn't feel comfortable with all these people in here looking at him, all of `his,' meaning the defendant's people, looking at him. And we would ask — if it would make this witness feel more comfortable, we would ask these people, just for a few minutes, be asked to step outside the courtroom until he testifies."
G.W.B. returned to the courtroom after speaking with his father, and the trial court conducted a voir dire examination of him, as follows:
 "[Trial court]: I understand that this is uncomfortable and awkward for you, and, you know, you've been ordered here to testify. And I am sure it is not something that you're looking forward to.
 "You understand that, you know, these are serious charges, and if there is something that you have to offer that will help this jury get to the truth" because that is the purpose of this matter is for this jury to get to the truth. If you've got something to offer that would help this jury get to the truth, then it's important that you testify; okay? Do you think you're ready to do that?
 "[G.W.B.]: I'm ready. I just — you know, I was wanting my dad and my family, some family members of mine in here with me.
 "[Trial court]: Okay. Well, is there anything that I can do to make you more comfortable about testifying?
 "[G.W.B.]: No, ma'am. You're fine. I mean, it's all right.
 "[Trial court]: Like I said, I understand that this is not pleasant, and I don't know what your testimony will be. I heard, I think, some point what somebody thinks you might testify to, and I am certain that it is not a pleasant experience for you. But you understand why it's important for you to testify if you have any information that will help the jury get truth in this case. I mean, that's all I'm ever after, is for the truth to come out in a case.
 "[G.W.B.]: Yes, ma'am."
 The trial court permitted G.W.B. to speak with his father a second time, after which, the trial court permitted the State to conduct a voir dire examination of G.W.B.:
 "[Prosecutor]: What do you mean you want `some of your people'?
 "[G.W.B.]: I don't know. I feel out-numbered.
 "[Prosecutor]: Okay. What do you mean by `outnumbered'? When you say `his people were in here, and mine aren't,' who did you mean when you said `his'?
 "[G.W.B.]: I don't know. I just know that I — I just feel something's out of place. I don't know. I don't know why I feel that way. But it don't —
 "[Prosecutor]: Would it make you feel comfortable if the spectators were asked to stay outside while you testify?
 "[G.W.B.]: Yes, sir."
Because G.W.B. had "verbalized hesitation about testifying," the trial court granted the State's motion to close the courtroom except for the jury and essential parties. Easterwood was allowed to choose one family representative to remain in the courtroom; he chose his mother. Easterwood renewed his objection to the *Page 371 
closing of the courtroom, and the following colloquy took place:
 "[Defense counsel]: We would again renew our objection, and I state this on even a higher plane maybe than I verbalized before. But the concern I have is that they have called a witness who says, okay, I feel like I'm — I don't have my people in here. He could. There's no reason not to. But the problem with the defendant, one of the main things of being able to face your accuser is the idea they have got to look at you and say something, and the same thing extends to family members and other people he may know.
 "Folks don't — folks don't lie as much if they're confronted with people they've got to lie to their face on. It's just a known fact. And that, I think, is the genesis of all of our rules about open courtrooms, confronting your accusers. And I think this ruling arbitrarily takes away that right [of] a fair trial [from] the defendant and takes away the right of the citizens to come and be interested in this case by asking everybody to leave the courtroom at the request of one witness because he wants his family in here, is what I heard him say initially. And so, I just don't see this happening on this type of witness. I think it is detrimental. I think it violates due process of law to do this. And I think it shuts down the courtroom arbitrarily.
 ". . . .
 "[Trial court]: All right. I'm not — well, I am fairly certain that the right of confrontation doesn't extend to extended family members of a defendant. It extends to the defendant and the defendant alone. And I am loathe to ever vacate the courtroom. However, statute has allowed for, you know, child victims to, in fact, testify in various ways so that they're not intimidated by this. And while this person is now an adult, the — I guess what he's going to be testifying to are acts that occurred during his childhood.
 "And like I said, my interest is to get to the truth. I don't see in any way how the defendant's right to a fair trial is going to be impugned by this one victim — I mean, with one of the defendant's family members of his choice staving throughout the testimony."
 I. The Court of Criminal Appeals' reliance upon § 12-21-202, Ala. Code 1975.
The Court of Criminal Appeals' holding that Easterwood'sSixth Amendment right to a public trial was not violated by the clearing of the courtroom was based in part on § 12-21-202, Ala. Code 1975. Section 12-21-202 provides:
 "In all prosecutions for rape and assault with intent to ravish, the court may, in its discretion, exclude from the courtroom all persons, except such as may be necessary in the conduct of the trial; and, in all other cases where the evidence is vulgar, obscene or relates to the improper acts of the sexes and tends to debauch the morals of the young, the presiding judge shall have the right, by and with the consent and agreement of the defendant, in his discretion and on his own motion, or on the motion of the plaintiffs or defendants or their attorneys, to hear and try the said case after clearing the courtroom of all or any portion of the audience whose presence is not necessary."
The first independent clause of § 12-21-202 allows the trial court to close the courtroom to all spectators in cases where the defendant is being tried for rape (§§ 13A-6-61 and -62, Ala. Code 1975) and assault with intent to ravish (former § 13-1-46, Ala. Code 1975, repealed in 1977). *Page 372 
Easterwood was being tried for first-degree sodomy; therefore, the trial court was not authorized to close the courtroom pursuant to the first clause of § 12-21-202.
The second independent clause of § 12-21-202, establishing the rule regarding "all other cases," does not authorize the trial court to close the courtroom in this case because, we conclude, that clause is applicable only to civil trials. We note that the Code section specifically refers to the parties as plaintiffs and defendants. We further note that Rule 9.3(b), Ala. R.Crim. P., [2] modified § 12-21-202 when it became effective on January 1, 1991. See Code Commissioner's Notes following § 12-21-202, Ala. Code 1975. The Committee Comments to Rule 9.3(b), Ala. R.Crim. P., state:
 "Rule 9.3(b) sets forth the right of a defendant to a public trial guaranteed by Article I, § 6, Alabama Constitution of 1901. All criminal proceedings after arrest, other than grand jury proceedings, should be public. Jackson v. Mobley, 157 Ala. 408, 47 So. 590 (1908). The last sentence allows the court to remove persons whose conduct is disruptive of the proceedings or who present a threat of physical danger to others present. . . . It is intended that Ala. Code 1975, § 12-21-202, permitting exclusion of certain members of the public where the evidence is vulgar or obscene, will not be applicable to criminal proceedings."
(Emphasis added.)
Accordingly, we conclude that the Court of Criminal Appeals erred to the extent that it relied on § 12-21-202, Ala. Code 1975, to affirm Easterwood's conviction in light of the trial court's decision to close the courtroom in this case.
 II. The applicability of Waller v. Georgia, U67 U.S. 39 (1984).
Article I, § 6, Ala. Const. 1901, guarantees that "in all prosecutions by indictment, [the accused has a right to] a speedy, public trial." The Sixth Amendment to the United States Constitution begins: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . ."A public trial ensures that the judge, prosecutor, and jury carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury. Waller v. Georgia,467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). InWaller, the defendants were indicted on gambling charges after court-authorized wiretaps revealed a large illegal lottery operation. The defendants moved to suppress the recordings resulting from the wiretaps. The State moved to close the suppression hearing, arguing that the unnecessary publication of the information obtained by the wiretaps would render that information inadmissible as evidence. The trial court agreed and closed the suppression hearing to everyone except witnesses, court personnel, and the parties. The defendants were ultimately convicted, and the conviction was affirmed by the Georgia Supreme Court. Waller, supra.
In holding that closing the suppression hearing was unjustified and violated the defendants' Sixth Amendment rights, the United States Supreme Court stated:
 "[T]he Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, *Page 373 
such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care."
Waller, 467 U.S. at 45, 104 S.Ct. 2210. TheWaller Court set forth the following test for the proper closure of a courtroom:
 "[1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure."
Waller, 467 U.S. at 48, 104 S.Ct. 2210.
In Ex parte Judd, 694 So.2d 1294 (Ala. 1997), the defendant was indicted on several counts of rape, sodomy, and sexual abuse. At the opening of the testimony, the trial court announced that upon motion of the State, it was going to close the courtroom during the testimony of the minor child. Defense counsel objected to the closure. The trial court overruled the objection, and the defendant was ultimately convicted of sexual abuse in the first degree and sodomy in the first degree. The defendant's conviction and sentence were affirmed on appeal by the Court of Criminal Appeals.
On petition for a writ of certiorari, this Court discussed the relevant federal and state authorities on the issue of closure of the courtroom and the defendant's right to a public trial; it specifically adopted the test set forth in Waller
for determining when a courtroom can be closed without violating the defendant's right to a public trial. Ex parteJudd, supra. This Court also discussed a distinction recognized in the cited authorities between a total closure of the courtroom and a partial closure. This Court stated:
 "In United States v. Osborne, 68 F.3d 94 (5th Cir. 1995), the Fifth Circuit addressed Waller
by setting out the four-part Waller test quoted above and then distinguishing Waller
in the following manner:
 "`There is a significant difference between Waller and the instant case, however. In Waller, the Supreme Court addressed a total closure of a suppression hearing, from which all members of the public were excluded. In the present case, the district court ordered only a partial closure of the proceedings, allowing all but one of the existing spectators to remain during the victim's testimony.
 "`Prior to the Waller decision, this circuit [had] addressed the constitutionality of a partial closure in Aaron v. Capps, [507 F.2d 685 (5th Cir.), cert denied, 423 U.S. 878, 96 S.Ct. 153, 46 L.Ed.2d 112 (1975)]. In Aaron, this court held that, when considering a partial closure, a trial court should look to the particular circumstances of the case to see if the defendant will still receive the safeguards of the public trial guarantee. This court reasoned that the partial closing of court proceedings does not raise the same constitutional concerns as a total closure, because an audience remains to ensure the fairness of the proceedings.
 "`Although this circuit has not had the opportunity to reexamine the constitutionality of a partial closing since the Waller decision, five other circuits have addressed the issue. The Second, Eighth, Ninth, Tenth, and Eleventh Circuits have all found that Waiter's stringent standard does not apply to partial closures, and have adopted a *Page 374 
less demanding test requiring the party seeking the partial closure to show only a "substantial reason" for the closure. As in this circuit's Aaron
decision, these courts have all based their decisions on a determination that partial closures do not implicate the same fairness and secrecy concerns as total closures.'
 "68 F.3d at 98-99 (emphasis original) (footnotes omitted). See also United States v. Farmer, 32 F.3d 369 (8th Cir. 1994); United States v. Galloway, 937 F.2d 542 (10th Cir. 1991), affirmed on return to remand, 963 F.2d 1388 (10th Cir. 1992); United States v. Sherlock, 962 F.2d 1349 (9th Cir. 1989); Douglas v. Wainwright, 714 F.2d 1532 (11th Cir. 1983), vacated and remanded, 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 874, panel opinion reinstated, 739 F.2d 531 (11th Cir. 1984); Geise v. United States, 262 F.2d 151 (9th Cir. 1958).
 "Thus, the Federal courts have recognized the public interest in protecting young victims of crime, particularly young victims of sexual offenses, who are required to testify against the person accused of assaulting them. This interest provides the `substantial reason' called for in Osborne
and the cases cited therein for a partial closure of a trial during the testimony of the minor victim. A `partial closure' usually means that the general public is excluded but that family and friends of the defendant are allowed to remain unless a specific reason for excluding them exists and, usually, that members of the press are allowed to remain."
Ex parte Judd 694 So.2d at 1295-96.
This Court ultimately concluded in Ex parte Judd that the defendant had failed to properly preserve for the record "the proceedings on the motion to close the courtroom, the considerations that led to the closure of the courtroom, who was cleared from the courtroom, or whether the courtroom remained closed after the victim's testimony." Ex parteJudd, 694 So.2d at 1297. This Court held that because the defendant had failed to include the relevant facts and proceedings in the record, it could not consider whether his constitutional rights had been violated. Ex parte Judd,supra.
Thereafter, the defendant petitioned the United States District Court for the Northern District of Alabama for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied the relief, concluding that the doctrine of procedural default precluded review of his right-to-a-public-trial claim. The defendant appealed the denial of his petition to the United States Court of Appeals for the Eleventh Circuit. See Juddv. Haley, 250 F.3d 1308 (11th. Cir. 2001) (discussing the procedural history of the Judd case).
In Judd v. Haley, the Eleventh Circuit Court of Appeals noted that a violation of one's right to a public trial is a structural error that is a "`defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" Judd,250 F.3d at 1315 (quoting Arizona v. Fulminante, 499 U.S. 279,310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Structural errors are not subject to a harmless-error analysis. Judd,250 F.3d at 1315. "Therefore, once a petitioner demonstrates a violation of his Sixth Amendment right to a public trial, he need not show that the violation prejudiced him in any way. The mere, demonstration that his right to a public trial was violated entitles a petitioner to relief." 250 F.3d at 1315.
The Eleventh Circuit Court of Appeals also discussed the distinction between a total closure of the courtroom and a partial closure and the applicable tests for each: *Page 375 
 "[W]e have recognized a distinction between total closures of proceedings, as in Waller, and situations where the courtroom is only partially closed to spectators. See Douglas v. Wainwright, 739 F.2d 531, 532 (11th Cir. 1984). When access to the courtroom is retained by some spectators (such as representatives of the press or the defendant's family members), we have found that the impact of the closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny. See id. at 533; Aaron v. Capps, 507 F.2d 685, 688 (5th Cir. 1975). Both partial and total closures burden the defendant's constitutional rights, and before either is undertaken, a court must `hold a hearing and articulate specific findings.' See Douglas, 739 F.2d at 532. However, in the event of a partial closure, a court need merely find a `substantial' reason for the partial closure, and need not satisfy the elements of the more rigorous Waller
test. See id. at 533; United States v. Brazel 102 F.3d 1120, 1155 (11th Cir. 1997).
 "We have relatively little precedent on the right to a public trial generally, and have not specifically addressed the question of how to analyze the total clearing of a courtroom during a portion of a criminal trial. However, the precedent that we do have defines `partial closures' as situations in which the public retains some (though not complete) access to a particular proceeding. See Douglas, 739 F.2d at 532 ('The most important distinguishing factor is that Waller involved a total closure[,] . . . the press and the public having been specifically excluded, whereas Douglas entailed only a partial closure, as the press and family members of the defendant, witness, and decedent were all allowed to remain'). Nowhere does our precedent suggest that the total closure of a courtroom for a temporary period can be considered a partial closure, and analyzed as such.
 "Furthermore, our prior cases have articulated the values that the Constitution's public trial guarantee seeks to protect, which include permitting the public to see that a defendant is dealt with fairly, ensuring that trial participants perform their duties conscientiously, and discouraging perjury. See id. at 531; Brazel, 102 F.3d at 1155. These values are only moderately burdened when the courtroom is partially closed to the public, as certain spectators remain and are able to subject the proceedings to some degree of public scrutiny. However, a total closure of the courtroom, even for a temporary period, eliminates for a time the valuable role the presence of spectators can have on the performance of witnesses and court officials, and can create a public perception that the defendant is not being treated justly.
 "Given these facts, we think that the only conclusion that can fairly be drawn from our precedent is that a total closure of a criminal trial during the presentation of evidence even for a temporary period, such as during the testimony of a particular witness, must be analyzed as a `total closure,' and subjected to the four-pronged test established in Waller. Notably, our sister circuits have also applied the stringent Waller test to circumstances in which the courtroom was completely cleared during the testimony of particular witnesses. See English v. Artuz, 164 F.3d 105, 108 (2d Cir. 1998); Bell v. Jarvis, 236 F.3d 149, 165-66 (4th Cir. 2000)."
Judd, 250 F.3d at 1315-16 (footnote omitted).
The Eleventh Circuit Court of Appeals went on to conclude that this Court had an *Page 376 
adequate record before it to properly evaluate the defendant's claim that he was denied his right to a public trial. The Eleventh Circuit concluded that a fair reading of the record indicated that the trial court had completely cleared the courtroom during the witness's testimony; thus, the trial court was obligated to apply the Waller test. The Eleventh Circuit further held that this Court's treatment of the defendant's federal claims was manifestly unfair and, therefore, inadequate for the purposes of the procedural-default doctrine.
The Eleventh Circuit applied the Waller test and concluded that the trial court failed to satisfy the fourth prong of that test, which requires the trial court to make adequate findings on the record to support its decision to close the courtroom. Thus, the Eleventh Circuit held that the defendant was entitled to habeas relief on his claim that his right to a public trial was violated. Judd,supra.[3]
Based on the authorities discussed above, we hold that before a trial court can order a total closure of the courtroom, even on a temporary basis, the four-prong test set forth inWaller must be satisfied:
 "[1] [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure."
Waller, 467 U.S. at 48, 104 S.Ct. 2210. However, in those situations where the trial court has ordered only a partial closure of the courtroom, the party seeking the closure need only advance a "substantial reason" for the closure.Judd v. Haley, supra. In finding a "substantial reason" for the partial closure, as opposed to the more stringent "overriding interest," the trial court still must satisfy the three remaining requirements of the Waller
test. A partial closure usually entails the exclusion of the general public from the courtroom proceedings while allowing the defendant's family, friends, and members of the press to remain, unless a specific reason exists for excluding the latter. Judd v. Haley, supra; Douglas, supra.
We now apply these principles to the facts presented by this case. The Court of Criminal Appeals concluded that the closure of the courtroom here amounted to a partial closure because, it reasoned, the trial court permitted Easterwood's mother to remain in the courtroom during G.W.B's testimony. Therefore, the Court of Criminal Appeals determined that theWaller test was not applicable. We disagree. A partial closure usually contemplates that the defendant's family, friends, and members of the press will remain in the courtroom. The record indicates that most, if not all, of the spectators in the courtroom were family and friends of Easterwood. If Easterwood's mother was the only person allowed to remain in the courtroom, it is doubtful that the constitutional considerations of the public-trial guarantee — promoting a fair trial, discouraging perjury, and ensuring that the prosecutor, judge, and jury act responsibly — could be adequately protected. Thus, we conclude that there was a de facto total closure of the *Page 377 
courtroom in this case, which invokes the Waller
test.
The trial court granted the State's motion to clear the courtroom because G.W.B., a 27-year-old convicted felon, had expressed a reluctance or hesitancy to testify in open court. G.W.B. stated that he was reluctant to testify because he was embarrassed by the nature of the testimony and because he felt "outnumbered" by the presence of Easterwood's "people" and the lack of his own. We also note that at one point during the colloquy with the trial court, G.W.B. announced that he was "ready" to testify. Additionally, in response to a question from the trial court asking whether there was anything that it could do to make G.W.B. more comfortable, G.W.B. responded "No, ma'am. You're fine. I mean, it's all right." Based on the above, we cannot say that, under Waller, an overriding interest was advanced that would justify the total closure of the courtroom in this case.
Accordingly, the decision of the Court of Criminal Appeals affirming the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, LYONS, WOODALL, STUART, SMITH, and MURDOCK, JJ., concur.
COBB, C.J., and PARKER, J., recuse themselves.
[1] The victim was Easterwood's stepson.
[2] Rule 9.3(b), Ala. R.Crim. P., provides:
 "(b) Spectators. All proceedings shall be open to the public, unless otherwise provided by law. Individuals may be removed from the courtroom for engaging in disorderly, disruptive, or contemptuous conduct, or when their conduct or presence constitutes a threat or menace to the court, parties, attorneys, witnesses, jurors, officials, or members of the public."
[3] It does not appear that the Eleventh Circuit rejected the substantive portion of this Court's discussion of the law inEx parte Judd, relating to a defendant's right to a public trial; rather, the Eleventh Circuit rejected only that portion of this Court's opinion in Ex parte Judd
holding that the record was insufficient to address the defendant's constitutional claim.