07-3306-pr
Gibbons v. Savage

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: October 16, 2008                    Decided: January 28, 2009)

Docket No.  07-3306-pr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ROBERT GIBBONS,

     Petitioner-Appellant,

v.

RICHARD A. SAVAGE, Superintendent Gowanda Correctional Facility

     Respondent-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: McLAUGHLIN, LEVAL, POOLER, *Circuit Judges*.

Petitioner appeals from the judgment of the United States District Court for the Southern District of New York (Brieant, *J.*), denying his petition for habeas corpus.  The state trial court's decision to exclude the public from the jury selection process for one afternoon was not justified in view of *Waller v. Georgia*, 467 U.S. 39 (1984).  Nevertheless, the temporary closure of the courtroom was too brief and trivial to justify overturning Petitioner's conviction where the only rulings of the court during the courtroom closure — the dismissal of certain jurors by reason of inability to serve — were done with the consent of both parties, and the court's introductory remarks to jurors were without objection.  While the harmless error standard is not applicable to denial of the

constitutional right of public trial, a violation which is brief and trivial does not necessarily require a mistrial. Affirmed.

ROBERT N. ISSEKS, Middletown, New York (Alex Smith, on the brief), for *Appellant*.

ANDREW R. KASS, Assistant District Attorney, Orange County, Goshen, New York, (Francis D. Phillips, II, District Attorney of Orange County, on the brief), for *Appellee*.

LEVAL, *Circuit Judge*:

Petitioner-Appellant Robert Gibbons appeals from a judgement of the United States District Court for the Southern District of New York (Brieant, *J.*) denying his petition for habeas corpus pursuant to 28 U.S.C. § 2254, seeking to overturn his New York State conviction for rape, incest, and endangering the welfare of a child. Gibbons claims that he is entitled to retrial because (1) he was deprived of his right to a public trial guaranteed by the Sixth Amendment, (2) he was denied a fair trial due to juror misconduct, (3) the receipt in evidence of tape-recorded conversations between Gibbons and his daughter violated his due process rights, and (4) he was denied effective assistance of counsel. The last-mentioned claims have no colorable merit; we discuss them only briefly. On the other hand, his claim of denial of the right to a public trial raises serious questions which call for some discussion. Although the trial court's decision to exclude the only spectator (the defendant's mother) on the first afternoon of jury selection was unjustified and the rule of harmless error is not applicable to denial of the right to a public trial, we nonetheless conclude that the incident was too trivial to require overturning the conviction.

**BACKGROUND**

Petitioner Robert Gibbons was convicted after a jury trial of Rape in the Third Degree, Incest, and Endangering the Welfare of a Child. Each of these offenses was based on his having had sexual relations, including intercourse, with his fifteen-year-old daughter. He was sentenced on October 6, 2004 to 2 to 4 years imprisonment on the rape and incest convictions, to run concurrently with a 1-year sentence of imprisonment on the endangering charge.

The trial evidence showed the following: After Gibbons and his wife divorced in 1992, Gibbons retained visitation rights to his son and daughter who continued to live with their mother. On October 2, 1999, Gibbons picked up his daughter from a school event, brought her to his home, and had sexual relations with her, which included intercourse. Gibbons drove his daughter home and implored her not to tell her mother.

Three years later, the daughter told her mother. The mother reported this incident to the police who began an investigation. As part of the investigation, the police placed a recorder on the daughter's telephone and had her contact Gibbons. The tape recorder did not function on the first call. The daughter called again, and this call was captured on the recorder, with the exception of the beginning of the conversation.

Two days later, Gibbons agreed to answer questions about the incident at the police barracks. After *Miranda* warnings, the officers asked Gibbons about the incident. Gibbons responded by saying "yeah, I fucked my daughter." (It was disputed at trial whether the response was intended as an admission that he had done so or was spoken sarcastically to ridicule and deny the charges). The officers continued to ask Gibbons questions and eventually arrested him

for the rape of his daughter. Soon thereafter, he said, "It was mutual, I didn't rape her. Did she say this was mutual. I didn't rape her." Gibbons was then indicted on the charges described above.

**I. Voir Dire and Public Trial**

Jury selection was conducted over several days, beginning in the afternoon of the first day. Before allowing prospective jurors to enter the courtroom, the trial judge closed the courtroom to all spectators, and expelled the only spectator, who was Gibbons's mother. The judge said, "[A]lthough this is an open courtroom, I cannot have spectators during jury selection." As explanation, the judge added that because of the small size of the courtroom, the large number of prospective jurors, and the court's desire not to have jurors in close proximity to spectators, closure to spectators was required. Defense counsel objected, telling the court that the lone spectator was Gibbons's mother, and arguing that Gibbons was entitled to a public proceeding. In response, the judge said that he was not "going to taint the entire jury pool," which would happen if he "put a relative right next to a potential juror." Defense counsel suggested that Gibbons's mother could sit in the well of the courtroom directly behind counsel. The judge rejected that solution, stating that "[n]o one goes in the well unless it's their attorneys or part of the defense team." The judge expressed concern that such an arrangement would cause a security problem and would make the jurors wonder who was sitting there. It was simply "going to cause more problems." The court adhered to its ruling, and refused to allow spectators in the courtroom for that afternoon's jury selection proceedings.

4

During that afternoon session of the jury selection proceedings, the judge gave general instructions to the prospective jurors and asked if anyone had family emergencies that would prevent them from serving. Together with the prosecutor, defense counsel, Gibbons, and a court reporter, the judge went into an adjacent room to talk privately with each prospective juror who claimed inability to serve. Several jurors were excused with the consent of both parties. After the conclusion of those private hearings with individual jurors, the judge addressed all the prospective jurors in the courtroom, reading the indictment and explaining the duties of jurors. The judge also questioned individual jurors as to whether they could be impartial. Upon the conclusion of this questioning, several prospective jurors were excused, in each case with the consent of both parties.

The next day, as the dismissal of some of the jurors on the first day had left some vacant seats in the spectator section of the courtroom, the judge opened the courtroom to the public, allowing Gibbons's mother to attend the remainder of the proceedings, during which Gibbons was tried and convicted.

## II. Appeal and Collateral Attack

On direct appeal to the New York Supreme Court, Appellate Division after his conviction, Gibbons asserted, among other claims, a violation of his Sixth Amendment right to a public trial. The court affirmed his conviction, reasoning that there was insufficient seating for all prospective jurors, and therefore the trial court's decision to exclude the public temporarily was not a violation of Gibbons's right to public trial. *People v. Gibbons*, 795 N.Y.S.2d 700, 701 (App. Div. 2d Dep't 2005). Leave to appeal was denied by the New York Court of Appeals. *People v. Gibbons*, 5 N.Y.3d 828 (2005) (Rosenblatt, J.).

5

After his unsuccessful attempt to overturn his conviction in the New York trial court pursuant to C.P.L. 440.10 on the ground of ineffective assistance of counsel, Gibbons filed his petition for habeas corpus pursuant to 28 U.S.C. § 2254 in the district court.  Judge Brieant denied the petition, but issued a Certificate of Appealability (COA), because, in his view, reasonable minds could disagree "with respect to the total effect of all these issues on the conviction."  *Gibbons v. Savage*, No. 7:07 Civ 03186 (S.D.N.Y. July 20, 2007).

**DISCUSSION**

This Court reviews a district court's decision to grant a habeas petition *de novo*. *Hemstreet v. Greiner*, 491 F.3d 84, 89 (2d Cir. 2007).  A federal court cannot grant habeas corpus overturning a state conviction with respect to a claim adjudicated on the merits in a state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  In addition, the writ may be granted in certain limited circumstances not pertinent to this claim by reason of erroneous fact finding.  *Id.* § 2254(d)(2).

On appeal, Gibbons contends that the rulings of the state trial and appeals courts on his claim of denial of a public trial represent an unreasonable application of clearly established federal law determined by the Supreme Court.

**I. Public Trial Right**

The right to a public trial is guaranteed by the Sixth Amendment and incorporated against the States by the Fourteenth Amendment.  *See Waller v. Georgia*, 467 U.S. 39 (1984).  The defendant has a right to an open, public trial, including during the jury selection.  *See Press-*

*Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 509-10 (1984) (*Press-Enterprise I*) (holding that the press and public have a First Amendment right to attend voir dire); *Waller*, 467 U.S. at 46 (explaining that the Sixth Amendment right to a public trial is at least as broad as the First Amendment right to a public trial recognized in *Press-Enterprise I*). As the Supreme Court recognized in *Press-Enterprise I*, the proceedings for the selection of the jury are an important part of the trial process. 464 U.S. at 505; *see also United States v. Sayeedi*, 903 F.2d 88, 91 (2d Cir. 1990) ("Jury selection is a 'critical stage of the criminal proceeding'" (quoting *Gomez v. United States*, 490 U.S. 858, 873 (1989))).

The defendant's right to public trial is not absolute, but there is a "presumption of openness." *Press-Enterprise I*, 464 U.S. at 510. To overcome this presumption and justify closing the courtroom to the public during a criminal proceeding, the Supreme Court has outlined four elements that must be satisfied:

> [(1)] the party seeking to close the [proceedings] must advance an overriding interest that is likely to be prejudiced,
> [(2)] the closure must be no broader than necessary to protect that interest,
> [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and
> [(4) the trial court] must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

Gibbons argues that the People must satisfy even a higher burden than *Waller* imposes because of the importance our Circuit and the Supreme Court have placed on having family members and friends attend trial. It is true that, in dictum, the Supreme Court has noted a "special concern for assuring the attendance of family members of the accused" at the trial proceedings. *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) (citing *In re Oliver*, 333 U.S. 257, 271-72 & n.29 (1948)). Previous opinions of this court have relied on this Supreme Court

7

dictum to note that the exclusion of family members "is not a step to be taken lightly." *Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996); *see also Carson v. Fischer*, 421 F.3d 83, 91 (2d Cir. 2005) (explaining that the "Court takes very seriously" the right to have family present at trial). However, the Supreme Court's decision in *Carey v. Musladin*, 549 U.S. 70 (2006), interpreting § 2254(d)(4)'s phrase "as determined by the Supreme Court," bars reliance on Supreme Court dictum, much less on circuit court precedents that extend Supreme Court holdings, as a basis for overturning state convictions under § 2254. *Rodriguez v. Miller*, 537 F.3d 102, 109 (2d Cir. 2008). In *Rodriguez*, we held that the precedent to apply in deciding whether a courtroom closure violated the defendant's right to a public trial is the Supreme Court's decision in *Waller*. *Id.* As neither *Waller* nor any other Supreme Court holding acknowledged the appropriateness of a different standard for the exclusion of family members than for the exclusion of the general public, an inferior court may not justify a grant of habeas corpus relief under § 2254 by reference to such a heightened standard. *Id.*

**A. The Proceeding Was Closed Within the Meaning of the Sixth Amendment**

The People argue that there was no "closure" within the meaning of the Sixth Amendment because limiting access to a courtroom is within the trial court's discretion. The People cite to several cases, including *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) and *People v. Colon*, 71 N.Y.2d 410 (1988), arguing that they support the proposition that a "closure" does not occur when the trial court places limitations on how many people can enter the courtroom. The cases cited by the People stand for the limited proposition that no single member of the public has a right to gain admittance to a courtroom if there is no available seat. That is, so long as the public at-large is admitted to the proceedings, the Sixth Amendment does not

8

guarantee access to unlimited numbers; the fact that a particular individual is not admitted does not constitute a violation of the Constitution.

The thrust of these cases is not applicable here. The public was categorically excluded. (The trial judge stated, "I cannot have spectators during jury selection.") This is not a case where some members were allowed to attend, but there was not sufficient room for others. We conclude that, when the trial judge ordered the courtroom closed to all spectators, the courtroom was closed within the meaning of the Sixth Amendment. To evaluate whether the closure was justified, we use the *Waller* standard.

**B. *Waller***

Under *Waller*'s first prong, a closure is not justified absent an "overriding interest" that supports it. 467 U.S. at 48. The principal justifications offered by the court were that all the seats in the spectator section would be taken by members of the venire, and that there was a risk of tainting the jury pool if a potential juror sat next to the defendant's mother. These were not compelling reasons. Even if the number of prospective jurors equaled or exceeded the number of seats in the spectator section of the courtroom, that was not sufficient justification to eject the only spectator from the courtroom. There were many ways of accommodating a single spectator, which might have been explored, including allowing either the sole spectator or a prospective juror to stand until seats became vacant when potential jurors were excused, or, as discussed further below, temporarily placing the lone spectator in another part of the courtroom. Absent some indication that the defendant's mother might communicate improperly with members of the venire, the mere fact that some might be in close proximity to her did not raise a meaningful risk to "taint the entire jury pool," as the judge suggested. *See People v. Taylor*, 612 N.E.2d 543,

9

548-49 (Ill. App. Ct. 1993) (holding that where there is no evidence of a reasonable likelihood that a defendant's family member would attempt to influence the jurors during voir dire, the trial judge's statement that he wanted to prevent "contamination" of potential jurors did not satisfy *Waller*'s "overriding interest" test).

Furthermore, even if maintaining distance between the defendant's mother and the prospective jurors amounts to an overriding interest in preventing proximity, the People must satisfy *Waller*'s second prong – that the action must be no broader than necessary to protect the overriding interest. 467 U.S. at 48. The court's ruling to ban *all* spectators was broader than necessary to preserve that separation, which could have been accomplished in an alternative fashion. There were a number of ways the trial court could have kept the proceedings open without the defendant's mother sitting next to a prospective juror. Among them, the trial judge could have:

- Accepted defense counsel's suggestion to have Gibbons's mother sit behind counsel, or in some other part of, the "well;"
- Called fewer jurors at the start, leaving some room for spectators;
- Required either a member of the venire or Gibbons's mother to stand until a seat became vacant; or
- Moved the proceedings to a larger courtroom — an option the court considered on the second day of voir dire.

Under *Waller*'s third prong, the trial court must consider reasonable alternatives to closing the proceedings. *Id.* We assume that, for purposes of a defendant's after-the-fact effort to set aside his conviction on the basis of exclusion of the public, the defendant may not rely on possible alternatives that no one suggested at the time. There is good reason not to allow the defendant to sandbag the trial judge by refraining from suggesting an alternative to closure at the time, but later relying on that alternative as one the trial court was compelled to consider. The

only alternative expressly suggested or expressly contemplated at the time was defense counsel's suggestion to allow Gibbons's mother to sit temporarily in the well, which is normally reserved for counsel and parties. Even with respect to this suggestion, we do not believe the trial judge satisfied the requirement of *Waller.*

Recognizing that the precise words of *Waller* were that the court is obliged to "consider reasonable alternatives," *id.*, we do not think the obligation is discharged if the court *considers* a reasonable alternative but then unreasonably rejects it. The obligation to "consider reasonable alternatives" seems to us to imply an obligation to accept the alternative when it would be reasonable to do so and unreasonable to refuse to do so.

While the trial court did literally "consider" the alternative suggested by the defendant of allowing the defendant's mother to sit in the well until more space became available in the spectator section, the court gave no respectable reason for refusing to adopt it. What the court said in explanation of its rejection of the suggestion was that "no one goes in the well unless it's their attorneys or part of the defense team." The judge added that it would cause a security problem and would make jurors wonder who was sitting there.

These were not adequate reasons for rejecting a reasonable alternative to closure of the courtroom. As for the proposition that "no one [except attorneys] goes in the well of the courtroom," nowhere is it written that this is an immutable rule. It is commonplace for trial judges to use parts of the well temporarily to accommodate a venire that overflows the spectator section or to accommodate spectators in exactly these circumstances. All that was needed was the judge's authorization.

11

What security problem the trial court had in mind (that might arise from seating the defendant's mother in the well) was not identified. While the defendant, without a doubt, was charged with a serious offense, this was not the trial of Osama bin Laden. There was no apparent reason for special concerns of safety or security. If the court's unexplained concern was that the defendant's mother might pass to her son some item of contraband, this could easily have been prevented in a variety of ways. The People did not claim at trial that any security interest would be compromised if the defendant's mother were temporarily seated in the well. Nor have the People suggested in their brief to this court any legitimate security concern which necessitated excluding the defendant's mother from the well.

As for the court's second reason – that prospective jurors might wonder who she was – we do not understand what difference it would make if the jurors wondered who was the lady sitting in the courtroom, or indeed even if they speculated that it might be the defendant's mother. We see no reason to believe the prospects of a fair trial would have been jeopardized by the jurors' speculation or realization that the defendant's mother was attending the trial. It was foreseeable at the time of the jury selection, furthermore, that the defendant's mother would continue to attend trial sessions. Jurors would see her in the spectator section of the courtroom day after day as the trial progressed and in all likelihood might ask themselves who she was. The possibility that members of the venire might speculate on the same question a few days earlier during jury selection was not a reasonable justification for excluding the only member of the public who sought to be present.

While a federal court reviewing a petition for habeas corpus which contests the actions of a state trial judge in administering the courtroom should surely be deferential, we find that no

12

reasons of even arguable validity were given for refusing to adopt the reasonable alternative which defense counsel suggested to the trial judge. Unreasonable rejection of a reasonable alternative does not satisfy the prong of *Waller* which requires the trial judge to "consider reasonable alternatives." 467 U.S. at 48.

As to the fourth prong, which requires the trial court to make findings adequate to support the closure, for the reasons explained above, the judge's findings did not justify the courtroom closure. We therefore conclude that in excluding the only member of the public who sought admission to the defendant's trial, the trial judge failed to satisfy the requirements of *Waller*.[1]

**C. Do Trivial Exclusions Require Overturning a State Conviction**

We recognize that the violation of a defendant's right to a public trial is not justified by a finding that the error was harmless. *Waller*, 467 U.S. at 49-50 & n.9; *Guzman v. Scully*, 80 F.3d 772, 776 (2d Cir. 1996). If it were, little or nothing would remain of the right because the presence or absence of public spectators rarely, if ever, will affect the result of a trial, at least in a manner that is perceptible.

The Supreme Court has divided court errors in criminal trials into two categories: trial errors and structural errors. *See Arizona v. Fulminante*, 499 U.S. 279, 307-10 (1991). Trial errors are those to which the harmless error analysis applies. *Id.* at 307-08. By contrast, structural errors are those to which the harmless error analysis does not apply, as they are deemed

---

[1]In affirming his conviction on appeal, the Appellate Division said nothing more than that the insufficiency of seating available in the courtroom justified exclusion of the public, including Gibbons's mother. *Gibbons*, 795 N.Y.S.2d at 701. As we explained above, this finding was not an adequate reason justifying the trial court's decision to expel the only spectator who sought admission.

13

to render a criminal trial fundamentally unfair. *See Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006); *Neder v. United States*, 527 U.S. 1, 8-9 (1999). The errors identified by the Supreme Court as falling in the "structural" category are denial of counsel, *see Gideon v. Wainwright,* 372 U.S. 335 (1963), a biased trial judge, *see Tumey v. Ohio*, 273 U.S. 510 (1927), racial discrimination in the selection of the grand jury, *see Vasquez v. Hillery*, 474 U.S. 254 (1986), the denial of the right of self-representation, *see McKaskle v. Wiggins,* 465 U.S. 168, 177-178, n.8 (1984), the denial of the right to trial by jury by giving a defective reasonable-doubt instruction, *see Sullivan v. Louisiana,* 508 U.S. 275 (1993), and the denial of a public trial, *see Waller*, 467 U.S. at 49.

As the nomenclature devised in *Fulminante* implies, "structural" errors ordinarily relate to fundamental rights involving the structure of the trial. When a criminal trial is conducted in a manner that renders it fundamentally unfair by depriving the defendant of a fundamental structural right, reversal of the conviction is ordinarily automatic. *Recuenco*, 548 U.S. at 218; *Neder*, 527 U.S. at 8. It appears beyond doubt that a defendant required to stand the full trial, or a substantial or important part of it, without the assistance of counsel would have his conviction reversed without inquiry into whether the error was harmless, and that the same result might well apply to one who, in spite of his demand to represent himself, was required to be represented by counsel throughout the trial, or for a substantial or important part of it. *See Gideon*, 372 U.S. at 342-43; *Faretta v. California*, 422 U.S. 806, 821 (1975). It does not necessarily follow, however, that every deprivation in a category considered to be "structural" constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation.

14

Suppose, for example, that in a lengthy, multi-defendant trial, three months into trial, for a few minutes after a luncheon recess, trial proceeded without the judge being aware that the attorney for one of the defendants had not yet returned to the courtroom. Assume that the evidence received during those few minutes had nothing to do with the temporarily unrepresented defendant's complicity, and that upon counsel's tardy return a few minutes later, counsel reviewed the evidence received in his absence and advised the court that, while he objected to the trial having been conducted in his absence, he had no objection to any of the evidence. Trial then continued for another several months. We very much doubt, notwithstanding the brief "structural" deprivation for an inconsequential portion of the trial, that the Supreme Court would require that the conviction be vacated.

Similarly, in the context of a denial of the right of public trial, as defined in *Waller,* it does not follow that every temporary instance of unjustified exclusion of the public – no matter how brief or trivial, and no matter how inconsequential the proceedings that occurred during an unjustified closure – would require that a conviction be overturned. Again, suppose that during some colloquy, the court ill-advisedly decided to exclude the public from the courtroom, but after a couple of minutes of hearing inconsequential discussion by counsel, recognized its mistake, and re-opened the courtroom. The contention that such a brief and trivial mistake could require voiding a criminal trial of many months duration seems to us unimaginable. Whether the explanation would be that so trivial an exclusion did not constitute a violation of the Sixth Amendment, or that there was a violation but too trivial to justify voiding the trial, we do not know. But we believe that, regardless of which explanation would be given, the result would be to allow the conviction to stand. We must speculate because the Supreme Court has never ruled on such a question.

In *Peterson v. Williams,* 85 F.3d 39 (2d Cir. 1996)*,* our court declined to vacate a conviction in spite of an unjustifiable, temporary courtroom closure, notwithstanding that it occurred during an important part of the proceedings, where the closure occurred without the awareness of the judge as the result of an administrative malfunction. *Id.* at 42. At the start, for security reasons, the public had been *justifiably* excluded and the door locked during the testimony of an undercover narcotics agent. After the conclusion of the undercover agent's testimony, however, as the result of an administrative oversight, the courtroom remained locked while the defendant testified. The mistake was brought to the attention of the trial judge only after the defendant completed his testimony. *Id.* at 41-42. Recognizing that the harmless error standard did not apply, we nonetheless ruled that the closure was too trivial to require that the conviction be vacated. *Id.* at 41-44.

In evaluating whether a closure is trivial, we look to the values the Supreme Court explained were furthered by the public trial guarantee, focusing on (1) ensuring a fair trial, (2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) encouraging witnesses to come forward, and (4) discouraging perjury. *Peterson*, 85 F.3d at 43 (citing *Waller*, 467 U.S. at 46-47). Essentially, our analysis turns on whether the conduct at issue "subverts the values the drafters of the Sixth Amendment sought to protect." *Smith v. Hollins*, 448 F.3d 533, 540 (2d Cir. 2006). In the odd circumstances of *Peterson*, we concluded that they did not, notwithstanding that the inadvertently extended closure occurred during one of the most important portions of the trial.

**D. The Incident Was Too Trivial to Justify Overturning Gibbons's Conviction**

Reviewing the public trial values in relation to this case, we conclude that the closure was too trivial to justify vacating Gibbons's conviction. The third and fourth values derived from

16

*Waller* and articulated in *Peterson* are not implicated by voir dire because no witnesses testified. These values, therefore, do not weigh either in favor or against a triviality finding. As to the first and second values, in the particular circumstances of this case, limiting presence at the voir dire proceedings to only the attorneys, judge, defendant, and prospective jurors for one afternoon did not subvert these values. Even if the trial judge had not excluded Gibbons's mother from the courtroom, she would not have been able to watch a significant portion of what occurred during that afternoon session because the private interviews of individual jurors as to their reasons for inability to serve were justifiably conducted in an adjacent room out of the hearing and sight of the other jurors. Further, nothing of significance happened during the part of the session that took place in the courtroom. The judge read the indictment, asked questions of a few jurors, and provided administrative details on what the jurors should expect if chosen. No prospective jurors were excused except with the consent of both parties. No peremptory challenges were made, and no objections were asserted by either party to anything that occurred. The next morning, when voir dire resumed, Gibbons's mother was allowed to watch the proceedings.

Although the closure was not justified, we conclude upon examination of all the details of what occurred, that event was too trivial to warrant the remedy of nullifying an otherwise properly conducted state court criminal trial. We need not rule on the metaphysical question whether, in view of the triviality of the incident, it was not a deprivation of a constitutional right, or in contrast, it was a violation of a constitutional right, but, in spite of the inapplicability of the harmless error rule, too trivial to justify vacating the state court's judgment.

**II.   Gibbons's Other Claims**

Gibbons raises three additional claims, none of which have merit.

First, he argues that his Sixth Amendment rights to confrontation and a fair trial were

17

violated by "misconduct" of a juror who influenced other jurors by giving his expert opinion on the authenticity of a tape recording. The county court held a hearing pursuant to Gibbons's motion to set aside the verdict, heard the testimony of jurors, and denied Gibbons's motion, finding in part that testimony of the juror who reported the impropriety was "completely incredible" and that Gibbons had failed to show by a preponderance of the evidence the facts necessary to support his claim. This conclusion does not constitute an unreasonable determination of the facts.

Second, Gibbons argues that his right to a fair trial was violated by the trial court's refusal to suppress a tape-recorded conversation between Gibbons and his daughter in spite of a gap in the recording. The New York courts held that there was no error because the People laid a proper foundation for the admission of the tape, further stating that the existence of a minor gap in the tape went to the weight of the evidence, not admissibility. We see no problem in the New York courts' determination. *See People v. Torres*, 523 N.Y.S.2d 893, 895 (App. Div. 2d Dep't 1988); *see also People v. Ely*, 68 N.Y.2d 520, 527 (1986). Gibbons's daughter and a police officer who was a contemporaneous witness to the recorded conversation testified to the fact that the tape recording accurately reflected the conversation. Gibbons lacked no opportunity to cross-examine or otherwise challenge the evidentiary foundation for the tape. In any event, Gibbons did not raise a federal constitutional challenge to the admission of the tape recording before the New York Appellate Division, and therefore did not preserve the argument for habeas review. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989).

Finally, Gibbons argues that he was denied his right to effective assistance of counsel based on the failure of counsel to: (1) effectively impeach Gibbons's daughter's credibility; (2) obtain her psychiatric and therapeutic history; and (3) put Gibbons on the witness stand during

18

trial. The New York courts disagreed. To prove ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel. *Id.* at 690-91. Gibbons has not shown that his counsel's decisions were anything other than strategic. Nor has he shown that different choices would have had any likelihood of altering the outcome of the trial, especially in view of the powerful evidence of his guilt. Therefore the state court's decision was neither contrary to, nor an unreasonable application of, federal law.

## CONCLUSION

We affirm the judgment of the district court.