NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1099n.06

Nos. 11-5244, 11-5340

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Oct 23, 2012**

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| **Plaintiff—Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| SIXTOS ARELLANO-GARCIA (11-5244) | ) | |
| MAURICIO OROZCO-RIOS (11-5340), | ) | **O P I N I O N** |
| | ) | |
| **Defendants—Appellants.** | ) | |
| | ) | |

Before: MOORE, WHITE, and LUCERO,[*] Circuit Judges.

**CARLOS F. LUCERO, Circuit Judge.** Mauricio Orozco-Rios and Sixtos Arellano-Garcia were participants in a cocaine-distribution ring based in Nashville, Tennessee. Orozco-Rios, one of the leaders of the distribution ring, pled guilty to conspiring to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 846. Arellano-Garcia, a mid-level dealer, was also charged with conspiracy to distribute five or more kilograms of cocaine, as well as possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). At trial, a jury convicted him on both counts.

---

[*]The Honorable Carlos F. Lucero, Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

On appeal, Orozco-Rios argues that certain quantities of drugs were improperly attributed to him. Arellano-Garcia contends that there was insufficient evidence to convict him, that the district court erred by requesting that a spectator leave the courtroom and by denying his proposed jury instructions, and that his sentence was unconstitutional. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm as to both defendants.

**I**

Orozco-Rios was one of the leaders of a cocaine distribution ring that imported drugs from Atlanta, Georgia for distribution in Nashville, Tennessee. As part of his business model, Orozco-Rios would sell the cocaine that he imported to "wholesale" dealers, who would then sell smaller quantities of cocaine to their own customers. One of these "wholesale" dealers was Roberto Jaimes-Jiménez, who was known by the nickname "Sueno." Sueno sold cocaine to Arellano-Garcia, who he considered to be one of his best customers. Several of Sueno's cohorts delivered cocaine to Arellano-Garcia, who then resold the drugs. This information was corroborated by a notebook seized by the Drug Enforcement Administration, which indicated that Arellano-Garcia owed Sueno at least $10,000, as well as intercepted phone calls in which Arellano-Garcia requested significant quantities of cocaine.

Both Orozco-Rios and Arellano-Garcia were charged with conspiring to distribute five or more kilograms of cocaine and with possessing one or more firearms in furtherance of a drug trafficking crime. In return for the prosecution dropping his firearms charge, Orozco-Rios pled guilty to the conspiracy count. According to the Presentence Investigation Report ("PSR"), Orozco-Rios was responsible for 127.5 kilograms of cocaine and 17.48 kilograms of marijuana. However, Orozco-Rios contested the attribution of 76 kilograms of cocaine found in a stash house in Atlanta.

At sentencing, the district court erroneously recalled that Orozco-Rios had admitted that he was responsible for at least 50 kilograms of cocaine, and refused to rule on the objection because it would not affect the applicable Guidelines range. The court adopted the PSR's findings and sentenced Orozco-Rios to 360 months' imprisonment—at the low end of his Guidelines range.

Arellano-Garcia went to trial on both the conspiracy and firearms charges. On the eve of his trial the prosecution filed an information pursuant to 21 U.S.C. §§ 851(a)(1) and 841(b), giving notice that it would rely on Arellano-Garcia's previous conviction of a felony drug offense. By filing this information, the prosecution exposed Arellano-Garcia to a mandatory minimum sentence of twenty years if convicted on the conspiracy charge. *See* 21 U.S.C. § 841(b)(1)(A). Following presentation of the prosecution's case, Arellano-Garcia moved for acquittal under Fed. R. Crim. P. 29. The court denied this motion, and the jury ultimately convicted Arellano-Garcia on both counts. Acknowledging the § 851 information, the court sentenced him to twenty years' imprisonment for the conspiracy conviction, and five years' imprisonment for the firearm conviction to be served consecutively.

Both Orozco-Rios and Arellano-Garcia timely appealed.

## II

Orozco-Rios argues that the district court committed procedural error by declining to specifically address his drug quantity objections based on the mistaken belief that Orozco-Rios had admitted responsibility for at least 50 kilograms of cocaine in his plea agreement. We generally "review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Archibald*, 589 F.3d 289, 294 (6th Cir. 2009) (quotation omitted). However, when a defendant "fail[s] to object to the district court's determination of the drug quantity, we review for

-3-

plain error." *United States v. Wade*, 318 F.3d 698, 704 (6th Cir. 2003). "We cannot correct an error pursuant to [Fed R. Crim. P. 52(b)] unless there is an error that is plain or clear under current law and that affects substantial rights." *United States v. Page*, 232 F.3d 536, 543 (6th Cir. 2000).

At sentencing, the district court stated its mistaken belief that Orozco-Rios had accepted responsibility for at least 50 kilograms. Following further discussion regarding drug quantity, the court recessed to allow defense counsel to consider whether the drug quantity objections would effect Orozco-Rios' Guidelines range. Orozco-Rios' counsel stated: "I concede that in the absence of 17.48 kilograms of marijuana as well as the 76 kilos found in Atlanta, in the absence of that, we still get to the 51-point—I believe it's 51.5." Based on this concession, the court declined to make a determination about the contested drug quantities because it would not affect the Guidelines range.

Regardless of the district court's mistaken belief regarding Orozco-Rios' plea admissions, the court was entitled to credit counsel's concession that Orozco-Rios was responsible for more then 50 kilograms of cocaine. *See* Fed. R. Crim. P. 32(i)(3)(A) (court "may accept any undisputed portion of the presentence report as a finding of fact"). We thus hold that the district court did not commit error, plain or otherwise, and that Orozco-Rios' sentence was procedurally reasonable. We further conclude that Orozco-Rios has not overcome the presumption that his within-Guidelines sentence is substantively reasonable. *See Rita v. United States*, 551 U.S. 338, 347 (2007).

**III**

**A**

Arellano-Garcia asserts that there was insufficient evidence to convict him. In reviewing a sufficiency of the evidence challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *United States v. Davis*, 473 F.3d 680, 681 (6th Cir. 2007) (quotation omitted).

To prove a charge of conspiracy, the prosecution was required to show: (1) an agreement between two or more persons to violate the law; (2) knowledge and intent to join in the conspiracy; and (3) participation in the conspiracy. *United States v. Salgado*, 250 F.3d 438, 446-47 (6th Cir. 2001). Arellano-Garcia maintains that he was only a small purchaser who was insignificant to the greater distribution conspiracy. In support of this position, he points out that some higher level conspirators did not know him. Arellano-Garcia also highlights testimony from a cooperating witness who delivered drugs for Sueno stating that Arellano-Garcia only paid $2,300 to $2,400 per delivery. Because these amounts do not represent massive quantities of cocaine, Arellano-Garcia casts them as potentially being for personal use. The evidence, however, tells a different story.

Contrary to Arellano-Garcia's claim that he dealt only in user quantities, Sueno told a co-conspirator that Arellano-Garcia re-sold the cocaine that he purchased. The same witness learned from Sueno that Arellano-Garcia used some of the cocaine he purchased to manufacture crack. Further, on a phone conversation recorded by law enforcement, Arellano-Garcia told Sueno that he would purchase more cocaine if his current supply "goes out by tomorrow." From this evidence a juror could easily conclude that Arellano-Garcia agreed to participate in a conspiracy to distribute cocaine.

Whether Arellano-Garcia agreed to participate in a conspiracy to distribute five kilograms or more presents a somewhat closer question. We take pause at the fact that the government cannot point to a specific five kilograms of cocaine that passed through Arellano-Garcia's hands. See *United States v. Pruitt*, 156 F.3d 638, 644 (6th Cir. 1998) ("While a person who participates in a

drug conspiracy does not necessarily agree to a specific amount in advance, no defendant may be held responsible for acts beyond the scope of his or her participation in the conspiracy."). However, the prosecution offered substantial evidence showing that Arellano-Garcia was an active participant in the conspiracy and was well aware of the large amounts of cocaine involved. *See United States v. Robinson*, 547 F.3d 632, 639-40 (6th Cir. 2008) ("Although a 'small-time' drug seller may not be responsible for all the transactions or actions of his associates, he is responsible for the conspiracy in which he participated.").

Arellano-Garcia had a close working relationship with Sueno, who was one of the most prolific cocaine dealers in the conspiracy. According to a cooperating witness, Sueno was distributing approximately two to six kilograms of cocaine per week. Arellano-Garcia visited Sueno several times a week, and Sueno described Arellano-Garcia as one of his "best clients." From the dealings between Arellano-Garcia and Sueno, it is clear that Arellano-Garcia was no marginal participant in the conspiracy. Arellano-Garcia repeatedly offered firearms to Sueno. And when another member of the conspiracy was arrested, Arellano-Garcia expressed concern for the arrested co-conspirator to Sueno. In the same recorded phone call, the two discuss an individual who may have assisted law enforcement in apprehending the co-conspirator and Arellano-Garcia urges Sueno to "get on the ball" to avoid further arrests. Coupled with the deferential standard of review, we conclude that this evidence of Arellano-Garcia's awareness of and involvement in the conspiracy is enough to support his conspiracy conviction.

Arellano-Garcia also asserts that there was insufficient evidence to convict him of possessing a firearm in furtherance of a drug crime under 18 U.S.C. § 924(c). When paired with the vicarious liability doctrine outlined in *Pinkerton v. United States*, 328 U.S. 640 (1946), we have held that "a

defendant may be convicted under [the prior version of § 924(c)] if a co-conspirator used or carried a firearm in connection with a drug-trafficking offense." *United States v. Myers*, 102 F.3d 227, 237 (6th Cir. 1996). However, as with any conspiracy charge, it was the government's burden to show "the crime was foreseeable and committed in furtherance of the conspiracy." *Wade*, 318 F.3d at 701.

The record is replete with evidence that co-conspirators carried firearms and that Arellano-Garcia was aware that firearms were part of the cocaine-distribution conspiracy. Notably, in one phone conversation intercepted by the government, Arellano-Garcia offered to sell Sueno an assault rifle, a modified shotgun, and a nine-millimeter handgun. In another intercepted call, Arellano-Garcia asked Sueno when he was "going to bring the pistol." Viewing this evidence in the light most favorable to the prosecution, we can infer that Arellano-Garcia could foresee that his co-conspirators were using firearms in connection with their drug trafficking. *See Wade*, 318 F.3d at 702 ("We may infer that a defendant in a drug conspiracy should have foreseen his coconspirator's firearm possession, but the evidence supporting that inference must be more than a mere generalized presumption that drug transactions involve guns.").

**B**

During trial, the district court requested that a spectator leave the courtroom to avoid making a juror uncomfortable. Arellano-Garcia contends that this request violated his Sixth Amendment right to an open trial. As a general matter, a trial court may not exclude members of the public from a trial absent "an overriding interest that is likely to be prejudiced." *Waller v. Georgia*, 467 U.S. 39, 48 (1984).

On the second day of Arellano-Garcia's trial, a juror sent a note to the court indicating that she recognized a member of the public who was observing the trial. The court questioned the

spectator, who stated that she was related to a co-conspirator, and that she was only a somewhat remote acquaintance of the juror. After the spectator stated that she would like to remain, the court responded: "I would prefer that she not stay. I'm not going to order her to leave. I prefer she not stay." The spectator then apologized to the court for causing any inconvenience, and following a short recess, departed. Following this exchange, both parties indicated that they had no objections to the manner in which the situation was handled.

It is well established that "the violation of a defendant's right to a public trial is not justified by a finding that the error was harmless." *Gibbons v. Savage*, 555 F.3d 112, 119 (2d Cir. 2009); *see also Waller*, 467 U.S. at 49-50 & n.9. But courts have consistently refused to find Sixth Amendment violations when a courtroom closure is so limited as to be trivial. *See, e.g., Gibbons*, 555 F.3d at 121; *United States v. Perry*, 479 F.3d 885, 890-91 (D.C. Cir. 2007); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994); *United States v. Sherlock*, 962 F.2d 1349, 1357-58 (9th Cir. 1992). In the instant case, the court requested—but did not demand—that a single spectator leave the courtroom. This limited exclusion does not implicate the policies underlying the Sixth Amendment, and may not constitute a constitutional closure at all. *Waller*, 467 U.S. at 46 ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." (quotation omitted)). Even assuming that the district court partially closed the courtroom, we conclude that the closure was trivial and thus does not warrant reversal.

**C**

Arellano-Garcia asserts that the district court committed reversible error by refusing to give requested jury instructions regarding absent witnesses. We will reverse a district court for refusing a requested instruction only if the instruction is: "(1) a correct statement of law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important that the failure to give it substantially impairs the defendant's defense." *United States v. Franklin*, 415 F.3d 537, 553 (6th Cir. 2005) (quotation omitted).

The prosecution gave notice that it was planning to call four of Arellano-Garcia's co-conspirators at trial, but ultimately decided against calling for their testimony. Arellano-Garcia requested special instructions permitting the jury to "infer that [the uncalled co-conspirators'] testimony would have been unfavorable to the government." The district court refused this instruction, finding that there was no legal basis for the proposed inference.

Our case law supports the district court's decision. "The general rule is that no such inference may be drawn by a jury because a party fails to call as a witness one who is in a legal sense a stranger to him and is equally available to the other side." *United States v. Blakemore*, 489 F.2d 193, 195 n.4 (6th Cir. 1973) (quotation omitted). There is no evidence that the four individuals in question were unavailable or that Arellano-Garcia was otherwise unable to call them to the stand if he believed that their testimony would help his case. Accordingly, the proposed instruction was improper.

**D**

The government filed an information under 21 U.S.C. §§ 851(a)(1) and 841(b) before trial indicating that Arellano-Garcia had previously been convicted of a drug felony. This information

set a mandatory minimum sentence of twenty years for the conspiracy charge.  *See* 21 U.S.C. § 841(b)(1)(A).  Arellano-Garcia asserts that this mandatory minimum sentence violated his right to due process, the Eighth Amendment ban on cruel and unusual punishment, and the separation-of-powers doctrine.

Our precedent firmly forecloses each of Arellano-Garcia's claims.  First, we have held that "mandatory minimum sentences, which limit a sentencing court's discretion with regard to [18 U.S.C.] § 3553(a) factors, are constitutional."  *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009) (citing *Harris v. United States*, 536 U.S. 545, 565-68 (2002)).  Second, the Supreme Court has emphasized that mandatory minimums do not facially violate the Eighth Amendment, and has upheld mandatory life sentences for drug crimes.  *Harmelin v. Michigan*, 501 U.S. 957, 994-96 (1991).  Third, we have "flatly rejected the claim that mandatory minimums unconstitutionally violate separation-of-powers principles."  *United States v. Cecil*, 615 F.3d 678, 696 (6th Cir. 2010) (quotation omitted).  In the absence of any legal basis for departing from our precedent, we hold that Arellano-Garcia's sentence was constitutional.

**IV**

For the foregoing reasons, we **AFFIRM** the convictions and sentences of Orozco-Rios and Arellano-Garcia.