Rel: March 24, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

_____

## CR-20-0919

_____

## William Darby

## v.

## State of Alabama

## Appeal from Madison Circuit Court
## (CC-18-3238)

McCOOL, Judge.

This appeal arises from an incident in which Jeffrey Parker was shot and killed by William Darby, a Huntsville police officer who was on duty at the time of the shooting. Darby was subsequently convicted of

murder, a violation of § 13A-6-2, Ala. Code 1975, and was sentenced to 25 years' imprisonment.

Facts

On April 3, 2018, Parker telephoned emergency 911 from his residence and "threaten[ed] to … blow his head off" (R. 595), so Officers Genisha Pegues and Justin Beckles of the Huntsville Police Department ("HPD") were dispatched to Parker's residence. When they arrived, Officer Pegues drew her handgun and stepped over the threshold of the front door such that "the left side of [her] body was partially in the door … and … the right side was out towards the porch area." (R. 605.) While standing partially inside the residence, Officer Pegues saw Parker sitting on a couch with "what look[ed] like a weapon to his head." (R. 601.) Officer Beckles was on the porch behind Officer Pegues and could not see Parker, but Officer Pegues told him that Parker had "a gun to his head," and Officer Beckles "radioed that to dispatch" so that other officers who might be responding to the residence would "know that there [was] a gun in play." (R. 651.) Darby was on duty at that time and was "pretty close" to Parker's residence, so when he "heard Officer Beckles come over the radio" and mention "a guy with a gun … threatening suicide," he began

2

driving toward the residence to provide assistance. (R. 900.) It would later be determined that Parker was actually holding "a flare gun that had been intentionally painted black" (R. 705), but there is no evidence indicating that any of the officers were aware of that fact.

Meanwhile, Officer Pegues was still standing partially inside Parker's residence and was talking with Parker in an attempt to prevent him from committing suicide, and, although she had drawn her handgun, the gun was "muzzle down" (R. 606), Parker was "calm" (R. 612), and she believed the situation was "de-escalating." (R. 634.) During that time, Darby arrived on the scene armed with a shotgun and, as he approached the residence, saw that Officer Pegues's handgun was not raised, prompting him to command her to "point [her] fucking gun at [Parker]" (R. 606) because Parker "could kill [her]." (R. 611.) According to Officer Pegues, Parker heard Darby yelling from outside the residence and, in response, said, "I don't want to hurt anybody," or "something to that effect" (R. 611); however, neither Officer Beckles nor Darby heard that statement. When Officer Pegues heard Darby command her to raise her handgun, she moved forward so that she was "full body in the home" and raised her handgun but almost immediately lowered it again. (R. 608.)

At that point, Darby and Officer Beckles entered the residence and began demanding that Parker put his weapon down, which was still pointed at his own head. Officer Pegues testified that she "could feel the tension just rising" (R. 612) when Darby entered the residence, so she began to plead with Parker to put his weapon down. However, despite the officers' commands and pleas, it was undisputed that Parker "[n]ever move[d] [the weapon] from his head" (R. 614), and, seconds after entering the residence, Darby shot and killed Parker while Parker was still seated on the couch. When asked if she had felt threatened by Parker, Officer Pegues testified that Parker "did not threaten [her]" (R. 613) or behave "in a threatening manner" (R. 614), that he did not "do anything to make [her] believe he wanted to do anything other than commit suicide" (id.), and that she "didn't think [he] was an imminent threat … to … anyone … but himself." (R. 628.)

Officer Beckles's testimony was consistent with Officer Pegues's testimony. According to Officer Beckles, although Parker refused to put his weapon down, he did not "show any hostility" or "aggression" toward the officers (R. 661), "didn't make any overt action to" indicate that he "was about to point [his weapon] at [the officers]" (R. 658), and appeared

4

to have the intent to harm only himself. (R. 661-62.) In fact, Officer Beckles testified that he "definitely thought … things were going in a direction [they] needed … to go" before Darby arrived. (R. 659.) Officer Beckles did testify that, if Parker had continued to refuse to put his weapon down, at some point the officers "were probably going to have to end up … terminating that threat." (R. 660.) However, Officer Beckles testified that "at [no] time during this event did [he] feel the need to take deadly force action." (Id.)

On cross-examination, Officer Beckles testified as follows:

"Q. … Now, would you say this individual holding a gun inside that house, he obviously had it in his hand regardless of where it was pointed, presented an imminent threat to you three officers?

"A. Yeah, anybody with a gun, yeah.

"Q. Okay. Does a person have to point that gun at a police officer to be an imminent threat?

"A. No, just due to the … slower reaction time we're going to have, no, they don't have to actually point it at us to become – to be a threat to us.

"Q. Okay. And he wouldn't have to move in any particular way to become a threat, would he?

"A. I would prefer it, but I don't think – nothing in the law that I've read says that they have to point it or make – take the first shot.

5

"Q. Okay. And what about the protocol for the HPD and the procedures in place for this kind of a call; does a person have to move or point their gun at an officer before an officer can take action … and stop it?

"A. No.

"Q. Okay. How many times did you officers, all three of you, tell this person to put the gun down?

"A. I think I told him two or three times, I think Officer Pegues told him once or twice, and I think Officer Darby told him twice.

"Q. Okay. So about seven times?

"A. Yes, sir.

"Q. Okay. And he did not comply?

"A. No."

(R. 673-75.)

On re-direct examination, Officer Beckles clarified that he believed Parker posed a <u>potential</u> threat to the officers but did not believe they were faced with the <u>imminent</u> use of deadly force that required them to use their own deadly force. According to Officer Beckles, a police officer is not authorized to use deadly force simply because a person "has a gun to [his own] head and [does not] comply" with a command to put the gun down. (R. 678.) Rather, Officer Beckles testified that, pursuant to the

6

HPD's standard operating procedures, the use of deadly force must be in response to a threat of death or serious physical injury that is "immediate, certain, and unequivocal," and, according to Officer Beckles, Parker's actions did not rise to that level. (R. 682.)

Det. Joshua Vogel of the HPD conducted the investigation of Parker's death and, as part of his investigation, interviewed Officer Pegues, Officer Beckles, and Darby; it appears that Det. Vogel also viewed the audiovisual recordings taken from the officers' body cameras. Det. Vogel testified that he did not "find any evidence of any kind that Parker ever did anything aggressive" or "ever made a hostile determination towards anybody other than himself." (R. 719.) On cross-examination, Det. Vogel conceded that "[a]n armed subject is always a danger to [a police] officer" (id.); however, consistent with Officer Beckles's testimony, he testified that, pursuant to HPD "policies and procedures," there is no "imminent danger" to the officer unless there is "an action by that individual" that is "unquestionable" (R. 721 (emphasis added)), and, according to Det. Vogel, Parker's refusal to put his weapon down did not rise to that level.

Darby testified in his defense and explained the reasoning behind his decision to shoot Parker:

"Q.   All right.  What happened …?

"A.   I'm third man on the scene.  I've got Officer Beckles right in front of me and I've got Officer Pegues inside the residence where we know we have a man with a gun.  So, my mind is racing and I'm trying to get as much information about this situation as possible and trying to take it in.  I move closer to where I can try to pick up on what Officer Pegues is doing; it seems like she is having some type of verbal exchange but she's not protecting herself.

"Q.   How is she not protecting herself?

"A.   Her body language, where she was standing, it was like she was talking to someone and had eye contact with someone to where they – she could see them and they could clearly see her, and we know he has a gun and we know it's in his hand because she said he had it to his head.  What made me think she wasn't protecting herself is, number one, it looks like you have eye contact with him, so that means he can see you, your body language as you're talking to him.  And on top of that, she's not pointing a weapon at him.  She's holding her weapon in her right hand pointed at the ground, which is not what we're trained to do.  And that caused a lot of fear for me.  The fear that I was about to watch something very bad happen to one of my officers that I work with, as in she was going to be shot because she wasn't protecting herself and she could see a subject that we know to be armed.

"Q.   Did she appear to be standing in the fatal funnel?

8

"A.  Yes, sir, right in the middle of it, which is the doorway.

"Q.  All right.  What happened next?

"A.  Well, I see this so I give her a verbal command, 'Point your gun at him,' and I said it loudly.  I said it to be heard.  And you have to raise your voice to cut through the intensity of that situation.  I yelled loud enough to where she could hear me through the intensity of this situation and the radio going on and who knows what was going through her mind: 'Point your gun at him.  He can shoot you.'  And she listened to me for a second, because she knew and she raised her gun.  But it was – it was for less than a whole second.  And I couldn't believe it.  I saw her raise her gun and then she put it down and she's in the house and she puts her hand up in front of her and she says, 'No, he's right here in front of me.'  So right now my fear is through the roof.  I have an officer standing in the fatal funnel that is not protecting herself, that has admitted he's right here in front of [her], and she has her hand out.  And she put her gun back against herself, pointed at the ground.

"Q.  Is this hand signal that you saw, is that – is there training for that?  Is that part of the procedure, to put your hand up?

"A.  No, sir.  To me it just seemed like she was losing control of the situation.  To me, it never seemed like she had control of the situation and this was just getting worse.

"Q.  All right.  What did you do next and what happened next?

"A.  I remember saying, 'Point your gun at him; he can shoot you.'  And I gave her time, because I wanted to believe that her and Officer Beckles … in front of me, something would change.  And I'm standing there and I'm looking

at them and I'm processing what is happening, what's about to happen, what do I know from my training and experience, what do I actually have right here. And I waited for a second or two and I was hoping that something would change. She stalled –

"Q. What do you mean she stalled?

"A. So she said, 'He's right here in front of me.' She takes a big step to the left, further into the house.

"Q. Now are you already up on the stoop with Officer Beckles at this time?

"A. I'm right behind him.

"Q. All right.

"A. She takes a big step to the left, further into the house, which appeared to me as in [her] stalling. [Her] verbal communication has ended and she was ready for me and Officer Beckles to get in that house to back her up. Officer Beckles saw that I had a shotgun and he let me go in front of him. ….

"….

"Q. All right. What happened after that?

"A. I moved into the house. Officer Beckles comes in behind me. I'm the point man. Officer Pegues is behind me; Officer Beckles is behind me. We refer to being on line as everybody being even. We weren't even.

"Q. Now at what point did someone tell this person with the gun to put the gun down?

10

"A.   I believe I was the first verbal command and I yelled it from outside that house.  I said, 'Put your gun down,' because no one else had said it that I knew of.

"Q.   Okay.  Did anybody put their gun down?

"A.   The subject did not put his gun down, no, sir.

"Q.   All right.  So you've approached the house, you've come up on the stoop, you've entered the house now with Officer Pegues and Officer Beckles.  Are you all three now in the fatal funnel?

"A.   Yes, sir.  We're in the house in clear shot of the subject with the gun in his hand, with nothing in between us.

"Q.   All right.  You had no cover?

"A.   No, sir.

"Q.   And you had no concealment?

"A.   No, sir, fully exposed.

"….

"Q.   All right.  What happened next?

"A.   Well, I'm point man now.  I've taken the situation because I was not willing to stand outside and let what was going to happen, happen.  So I'm in the house and I'm in front, and I pointed my gun at the individual with a gun in his hand and a finger on the trigger and I gave him a very loud and distinct verbal command to drop that gun.  He said, 'I'm not going to drop the gun.'  I said, 'I am not going to tell you again,' while I'm still pointing my gun at him.  I said, 'I am not going to tell you again.'  And he looked at me dead-pan in the face, eye contact,

11

and shrugged his shoulders and shook his head, like he was calling a bluff, no emotion. That caused so much fear, I mean it was all the precursors of intent. And after I said, 'I am not going to tell you again,' and he shrugged his shoulders and shook his head – when he shrugged his shoulders the gun moved in an upward position. Now it never left the vicinity of his head …. But when he shrugged his shoulders and shook his head after I told [him], 'I am not going to tell you again,' the last thing I remember seeing is him shaking his head and shrugging his shoulders and I … fired one round at the subject.

"….

"Q. When you approached the stoop, what was your training telling you to do?

"A. Coach an officer into a better position to defend herself and when that wasn't working and she didn't listen, my training was to not just stand by; it's to take an action and to prevent that from happening. … My training was to get that person to remove the threat to my life or anyone else's that it is a threat to.

"Q. Why didn't you reach in and grab [Officer Pegues] by the arm and pull her back out the door?

"A. That was one of the things that ran through my head when I turned to the left and as soon as I thought about that I thought about a negligent discharge. She's obviously not thinking correctly. If I put my hand on her that could cause a sympathetic response. She's already got her hand on her gun; I didn't want to cause her to accidentally shoot herself or shoot me or if she starts fighting with me because it's a sympathetic response to then pull away when someone grabs you; we're both hung up in the fatal funnel and no one is paying

12

attention to the threat, the individual with the gun in his hand. So getting shot, her accidentally getting shot, or both of us getting shot by the threat that nobody's paying attention to didn't seem like the best course of action.

"Q. All right. Why didn't you tell her back out, back out, back out?

"A. She wasn't listening to me to keep her gun up. At that point she wasn't listening to the coaching from outside to protect herself; I didn't see any point in wasting any more time. She, at that point, I believed – especially when she moved to the left so we could go in – I had to go in; to stand there and to try to coach her any more is just wasting time. And the time was ticking. And I thought if I waited any longer she was going to get shot."

(R. 906-25.)

On cross-examination, Darby testified that Parker's refusal to put his weapon down constituted an imminent threat to the officers' lives. (R. 938.) Darby then testified as follows:

"Q. Simply holding the gun, pointing it at himself was the imminent threat to your life?

"A. No, … [a]s I've explained before, there's no cover between myself and the other officers and [Parker]. And …, under Alabama state law, it is considered an action, the omission of an act, possession of a gun, not responding to lawful commands by an officer to drop your gun, that all goes into being an imminent threat.

"….

13

"Q.   So he … had done something worthy of death?

"A.   In the whole part of this case, he did things that required deadly force be taken against him.

"….

"Q.   And you correct me if I'm wrong here.  But the choices that Parker took, the hostile action that he took that day was he called 911, he pointed the gun at himself, and he did not put it down when you told him to.  Did I miss anything?

"….

"A.   What he did to forfeit his life that day is he was in possession of a firearm in the same room with police and refused to put that gun down seven times.  And there were pre-assault indicators that I reasonably perceived through my training and experiences and he did not put down his gun.  And on top of that, the last thing I saw was a dead-panned eye contact, shaking his head no, told me he wasn't going to put the gun down, and when he shrugged his shoulders I saw the gun start to move and I broke the shot.  That's what forfeited his life was him; he decided not to obey one of those seven lawful commands to remove the imminent threat to our lives.

"Q.   I'm going to go back to something because that was the first time I heard you mention it.  What – pre-assault cues, is that the word you used?

"….

"A.   … [P]re-assault indicators.

"Q.    Maybe that was it, pre-assault indicators. … I want you to specifically tell us the pre-assault indicators that Parker had.

"….

"A.    Extremely calm and defiant in the face of police, with a gun involved, finger on the trigger to where he could readily use it, defied seven lawful commands, a behavior of defiance, abnormal emotional state, the call details, the way he was acting in that room, thing after thing just added up to the totality of the circumstances that showed me his intent.  And they add up to where I had to make the ultimate decision."

(R. 940-53.)

Darby also presented testimony from three other law enforcement officers who each testified that Parker's refusal to put his weapon down constituted an imminent threat to the responding officers' lives.  Cpt. Dewayne McCarver of the HPD testified that there is "[a]bsolutely" an "imminent threat" to a police officer when a person is "holding a firearm [and] refus[es] to put it down after being told to do so seven times."  (R. 840.)  Thus, according to Cpt. McCarver, Darby acted in compliance with his training and "did exactly what he was supposed to do" when he shot Parker.  (R. 856.)  Ron Kiker, the assistant police chief at Snead Police Department, similarly testified that, when a police officer confronts an armed person, there are "a lot of physiological cues … that would indicate

15

that an attack [is] imminent" (R. 815), including the person's refusal to comply with a command to put the weapon down. (R. 819.) Curtis Parker, a special agent with the Federal Bureau of Investigation who teaches an "officer survival course" (R. 877), likewise testified that a police officer faces an "imminent threat" (R. 890) when "a person with a gun … is noncompliant with orders to drop the gun." (R. 889.) In addition, Darby presented extensive evidence regarding the training a police officer receives with respect to confrontations with an armed person and the difficulties involved in safely navigating such confrontations.

## Discussion

On appeal, Darby argues that the trial court erred by refusing to give three of his requested jury instructions; he also argues that the trial court violated his right to a public trial and that the jury's verdict was against the great weight of the evidence. We conclude that the trial court's refusal to give one of the requested instructions was reversible error, and we remand the case for a new trial on that basis. Because we reverse on that basis, we pretermit discussion of the other issues Darby has raised.

"'"A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case."' Toles v. State, 854 So. 2d 1171, 1175 (Ala. Crim. App. 2002), quoting Coon v. State, 494 So. 2d 184, 186 (Ala. Crim. App. 1986).

"'A trial court's refusal to give a defendant's requested jury instruction "constitutes reversible error only if such instruction (1) was correct, (2) was not substantially covered by the [trial] court's charge, and (3) concerned a point in the trial which was so important that the failure to give the instruction seriously impaired the defendant's ability to defend himself." Dill v. State, 600 So. 2d 343, 353-54 (Ala. Crim. App. 1991), aff'd, 600 So. 2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1293, 122 L. Ed. 2d 684 (1993).'

"Ex parte R.D.W., 773 So. 2d 426, 429 (Ala. 2000)."

Johnson v. State, 168 So. 3d 163, 167 (Ala. Crim. App. 2014).

According to Darby, the trial court erred by refusing to give his requested instruction no. 35, which stated:

"The reasonableness of an officer's actions in using deadly force must be objectively reasonable judged from the perspective of a reasonable officer on the scene, the fact that officers are forced to make split-second decisions, and in light of the facts and circumstances confronting them at the time."

(C. 211.) Darby argues that the "legal foundation" (Darby's brief, p. 50) for this instruction is § 13A-3-27(b)(2), Ala. Code 1975, which states: "A peace officer is justified in using deadly physical force upon another

17

person when and to the extent he reasonably believes it necessary in order … [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force." According to Darby, that statute "frames law enforcement use of force through the lens of a reasonable officer" and not "[a]n everyday layperson [who] simply isn't similarly situated to a trained law enforcement officer." (Darby's brief, p. 51.) Thus, Darby argues, the trial court should have instructed the jury that, in determining whether his use of deadly force was reasonable, it was to evaluate his actions from the perspective of a reasonable police officer in the same situation.[1]

---

[1]In its brief to this Court, the State argues that, "while Darby currently asserts that … § 13A-3-27 … serves as a foundation for [requested] instruction [no.] 35, he did not present that argument to the trial court. He cannot now place the trial court in error on grounds not first presented to it." (State's brief, p. 60.)

It is true that Darby did not cite § 13A-3-27(b)(2) in arguing for requested instruction no. 35 at trial; instead, he cited the United States Supreme Court's decision in Graham v. Connor, 490 U.S. 386 (1989) – a case that is not controlling given that it involved a civil action brought under 42 U.S.C. § 1983. See People v. Perry, 36 Cal. App. 5th 444, 465, 248 Cal. Rptr. 3d 522, 536 n.10 (2019) ("Perry contends throughout his briefing that we are bound to apply the standards articulated in Graham in this case. Graham was a civil rights action brought pursuant to section 1983 of title 42 of the United States Code and it involved an alleged violation of the Fourth Amendment. Long-standing and deeply held

18

As a threshold matter, we note that neither the parties nor the trial court appears to have recognized at trial that Darby's use of deadly force was governed by § 13A-3-27(b)(2). We also note that there is a pattern jury instruction that tracks the language of § 13A-3-27(b)(2), and "[t]he appellate courts of this state endorse the use of the Alabama Pattern Jury Instructions in criminal cases." Ex parte McGriff, 908 So. 2d 1024, 1033 (Ala. Crim. App. 2004). However, Darby not only failed to request that

principles of federalism counsel that we have no obligation to import those standards into our state law defining criminal offenses.").

However, in Ex parte Jenkins, 26 So. 3d 464 (Ala. 2009), the Alabama Supreme Court explained that the preservation rule "generally prevents an appellant from raising on appeal a question or theory "that was not raised at trial but does not prevent an appellant from citing "an additional specific reason or authority for a theory or position asserted by the party in the lower court." Ex parte Jenkins, 26 So. 3d at 473 n.7. See also Ex parte Knox, 201 So. 3d 1213, 1217 (Ala. 2015) (noting that, pursuant to Ex parte Jenkins, an appellant may "provide additional precise reasons and authorities [on appeal] in support of a theory or position properly raised below" (emphasis added; emphasis omitted)).

Here, Darby clearly raised below the "question or theory," Ex parte Jenkins, 26 So. 3d at 473 n.7 (emphasis omitted), he has raised on appeal, i.e., that the trial court should have instructed the jury to evaluate his use of deadly force from the perspective of a reasonable police officer in the same situation. Thus, Darby's failure at trial to raise § 13A-3-27(b)(2) as authority for requested instruction no. 35, while perhaps unwise, does not preclude him from raising that statute as authority for the instruction on appeal.

19

pattern instruction, he never even mentioned § 13A-3-27(b)(2) to the trial court, and, thus, we would not hold the trial court in error for failing to give that instruction even if Darby had asked us to do so, which he has not done. Shouldis v. State, 953 So. 2d 1275, 1282 (Ala. Crim. App. 2006). We do, however, note that, had Darby asked the trial court to give the pattern instruction based on § 13A-3-27(b)(2), he would have been entitled to that instruction because that instruction is typically required in cases involving a defendant police officer who claims to have used deadly force in self-defense or defense of another while acting in his capacity as a police officer.

We turn, then, to a review of the instruction that Darby actually requested, which went beyond the four corners of both § 13A-3-27(b)(2) and Alabama's general self-defense statute, codified at § 13A-3-23, Ala. Code 1975, which served as the basis for the self-defense instruction that the trial court gave in this case. In essence, requested instruction no. 35 would have explained that, in determining whether Darby's use of deadly force was reasonable, the jury must evaluate his actions from the perspective of a reasonable police officer in the same situation. According to Darby, that instruction was required because, he says, it is a correct

20

statement of law and it was critical to his defense, which was that a reasonable police officer in the same situation would have perceived, based on the officer's training, that Parker's conduct represented the imminent use of deadly force.

In any self-defense or defense-of-another case, whether the defendant is a police officer or not, the jury must evaluate the defendant's use of force from the perspective of "'a reasonable person under like circumstances.'" State v. Neel, 57 So. 3d 186, 192 (Ala. Crim. App. 2010) (quoting King v. State, 478 So. 2d 318, 321 (Ala. Crim. App. 1985)).  In other words, in any case involving a claim of self-defense or defense of another, "'"a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge.'"'" Harrington v. State, 858 So. 2d 278, 298 (Ala. Crim. App. 2002) (quoting People v. Jaspar, 119 Cal. Rptr. 470, 476, 98 Cal. App. 4th 99, 108 (2002), quoting in turn People v. Humphrey, 13 Cal. 4th 1073, 1083, 56 Cal. Rptr. 2d 142, 148 (1996)).  And, in most such cases, a general instruction to that effect will suffice.

However, by enacting § 13A-3-27(b)(2), which applies only to peace officers, the Alabama Legislature has made clear that there is a unique

standard to be used in judging a police officer's use of deadly force in self-defense or defense of another while acting in his capacity as a police officer. Thus, the proper perspective from which to evaluate a police officer's use of deadly force in such situations is indeed that of a reasonable police officer in the same situation, as Darby argues.[2] And it is well settled that "'"[e]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence."'" Johnson v. State, 168 So. 3d 163, 167 (Ala. Crim. App. 2014) (quoting Harbin v. State, 14 So. 3d 898, 909 (Ala. Crim. App. 2008), quoting in turn Ex parte Chavers, 361 So. 2d 1106, 1107 (Ala. 1978)).

We thus hold that, in cases where there is evidence to support a defendant police officer's claim that he used deadly force in self-defense or defense of another while acting in his capacity as a police officer, the trial court should instruct the jury to evaluate the defendant's actions

---

[2]We acknowledge the State's argument that whether there should be "unique standards for [a police officer's] use of deadly force … in … self-defense" is a "policy decision … for the Alabama Legislature, not the appellate courts." (State's brief, pp. 60-61.) But the legislature has provided a unique standard for police officers by enacting § 13A-3-27(b)(2).

from the perspective of a reasonable police officer in the same situation. See State v. Smith, 73 Conn. App. 173, 205, 807 A.2d 500, 519 (2002) (holding that, pursuant to a Connecticut statute that is similar to § 13A-3-27(b)(2), "the reasonableness [of a police officer's use of deadly force] is to be judged from the perspective of a reasonable police officer" and that the jury should have been instructed accordingly). See also State v. Pagotto, 361 Md. 528, 549, 762 A.2d 97, 108 (2000) ("A defendant's conduct is typically measured against the conduct of an ordinarily prudent citizen similarly situated. Where the accused is a police officer, however, the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer similarly situated." (citations omitted)); and State v. White, 988 N.E.2d 595, 617 (Ohio Ct. App. 2013) ("In assessing the [police] officer's decision to use force, including deadly force, … [t]he required perspective is that of the 'reasonable officer on the scene,' standing in the defendant-officer's shoes, perceiving what he then perceived and acting within the limits of his knowledge or information as it then existed." (emphasis omitted)).

That is not to say that the trial court was required to give the precise instruction that Darby requested. As we have already noted, "[a] trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case." Johnson, 168 So. 3d at 167 (citations omitted). Thus, "[a]s long as the [trial court's] instructions accurately state the law, the court is not required to use specific language suggested by defense counsel." United States v. Griggs, 54 F.4th 531, 536-37 (8th Cir. 2022). In this case, however, the trial court did not provide any instruction that we can say "substantially covered" the essence of requested instruction no. 35, which was generally a correct statement of law. Johnson, 168 So. 3d at 167 (citations omitted). The closest the trial court came to such an instruction was when the court explained that, for Darby's use of deadly force to be justified, he had to reasonably believe that he was faced with the imminent use of deadly force, at which point the court gave the following instruction:

> "Actual imminent peril means that the circumstances and conditions perceived by the accused at the time he did the homicidal act were such as what a reasonably impressed or reasonable person that the accused was in danger of immediately being killed or seriously harmed in body by the

24

deceased and that the accused honestly believed himself to be in such danger though, in truth, he was not in danger."

(R. 1089.) However, that instruction is somewhat unclear on its face, and, "'evaluat[ing] [the] instructions like a reasonable juror may have interpreted them,'" Capote v. State, 323 So. 3d 104, 140 (Ala. Crim. App. 2020) (quoting Ingram v. State, 779 So. 2d 1225, 1258 (Ala. Crim. App. 1999)), we cannot say that the jury would have understood from that instruction that it was required to evaluate Darby's use of deadly force from the perspective of a reasonable police officer in the same situation. Thus, although the trial court was not required to use the precise language in Darby's requested instruction, the court erred by refusing to instruct the jury, in some fashion, that it must evaluate Darby's use of deadly force from the perspective of a reasonable police officer in the same situation.

Our holding that the trial court's jury instructions were faulty does not conclude our analysis, however, because it is well settled that "'faulty jury instructions are subject to harmless error review.'" Bohannon v. State, 222 So. 3d 457, 510 (Ala. Crim. App. 2015) (quoting State v. Williams, 364 Wis. 2d 126, 148, 867 N.W.2d 736, 746 (2015)). In order to determine that an error in jury instructions was harmless, this Court

considers the totality of the circumstances and must be able to conclude beyond a reasonable doubt that the jury's verdict would have been the same even if the omitted instruction had been given. Sharifi v. State, 993 So. 2d 907, 943-44 (Ala. Crim. App. 2008); Simmons v. State, 797 So. 2d 1134, 1173 (Ala. Crim. App. 1999).

In this case, Darby presented extensive testimony from multiple witnesses regarding the training a police officer receives with respect to confrontations with an armed person. We need not set forth that extensive testimony here; suffice it to say that the testimony supported a finding that a reasonable police officer in Darby's situation could have concluded that Parker's conduct represented the imminent use of deadly force. In other words, that testimony supported a finding that Darby acted in self-defense or defense of another when he shot Parker. § 13A-3-27(b)(2).

Of course, the jury was not required to accept that testimony as conclusive, and it is possible that the jury simply did not find the testimony persuasive. Rather, the jury may have found more persuasive the testimony of Officer Pegues, Officer Beckles, and Det. Vogel, who each testified that, from their perspective, Parker's conduct did not represent

26

the imminent use of deadly force. If so, the jury's verdict was based upon its consideration of all the testimony after evaluating the credibility of the witnesses and assigning weight to the evidence as it deemed appropriate, and it would therefore be improper for this Court to overturn the verdict on appeal. See Jones v. State, 915 So. 2d 78, 85 (Ala. Crim. App. 2005) ("We will not second-guess the jury's determinations regarding the credibility of the witnesses and the weight of the evidence.").

However, it is equally possible that the jury did not base its verdict upon its careful consideration and weighing of the testimony and evidence but, rather, upon a faulty understanding of its duty to view that testimony and evidence from the proper perspective. In other words, rather than fulfilling its duty to consider and evaluate all the evidence and reaching a conclusion of fact, the jury may have reached an erroneous conclusion of law and determined that the evidence regarding a police officer's training was simply not relevant and should be disregarded because it was not instructed to evaluate Darby's use of deadly force from the perspective of a reasonable police officer. In fact, we note that the State made a point of arguing to the jury that "[police] training is not the

law" (R. 1023) – that is, that the jury should disregard that evidence because the law <u>required</u> the jury to ignore it.

Because the testimony regarding a police officer's training supported a finding that Darby acted in self-defense or defense of another, the omission of a jury instruction regarding the proper perspective from which to evaluate such evidence raises legitimate questions as to whether the jury's verdict was affected by its omission. We recognize that juries are presumed to apply a "'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" <u>Callen v. State</u>, 284 So. 3d 177, 225 (Ala. Crim. App. 2017) (quoting <u>Boyde v. California</u>, 494 U.S. 370, 381 (1990)). We also recognize that the trial court instructed the jury that Darby's actions had to be objectively reasonable and that the jury's reasonableness determination had to be based on "the circumstances and conditions perceived by the accused," whom the jury clearly knew was a police officer. Thus, given the extensive testimony Darby presented regarding a police officer's training, it is quite possible that the jury evaluated his use of deadly force from the perspective of a reasonable police officer in the same situation, even without a clear and explicit instruction to that effect, and simply did

not find that testimony to be persuasive. It is also possible that the jury dismissed that testimony as irrelevant because it was not instructed to evaluate the evidence from the proper perspective.

In the midst of these possibilities, however, the law is certain: this Court does not deal in "possibilities" when it comes to a harmless-error analysis regarding the erroneous refusal to give a requested jury instruction that is a correct statement of law. If we cannot conclude beyond a reasonable doubt that the jury evaluated Darby's use of deadly force from the proper perspective, then we cannot conclude that the trial court committed harmless error by refusing to give requested instruction no. 35 or some similarly worded instruction. As the New Mexico Court of Appeals has observed:

> "In such close circumstances, where the error involves the central issue in the case, it is the better policy to require a new trial under the correct instruction. Requiring a new trial obviates any need or opportunity for us to speculate as to how the jury might have resolved – or will resolve – the case under the correct instruction."

State v. Mantelli, 131 N.M. 692, 702, 42 P.3d 272, 282 (2002).

We agree with the reasoning of the New Mexico Court of Appeals in Mantelli. Accordingly, we reverse Darby's conviction and remand the case for a new trial.

29

REVERSED AND REMANDED.

Windom, P.J., and Kellum and Minor, JJ., concur. McCool, J., concurs specially, with opinion. Cole, J., concurs in the result.

McCOOL, Judge, concurring specially.

I authored the main opinion and thus concur fully in the Court's decision to reverse William Darby's conviction and remand for a new trial. Because the Court holds that Darby is entitled to a new trial based on the trial court's refusal to instruct the jury that it must evaluate his use of deadly force from the perspective of a reasonable police officer in the same situation, it is unnecessary for us to address Darby's remaining claims. Those claims include a claim that the trial court violated Darby's right to a public trial and a claim that the court erred by refusing to give two other jury instructions that he requested. I write specially to address those issues because I believe it is important to explain why Darby was not entitled to relief on those claims.

## I. Darby's Right to a Public Trial

In response to the COVID-19 pandemic, the trial court closed the courtroom to the public during Darby's trial. However, to ensure that the trial remained accessible to the public, the court provided "remote viewing" by broadcasting the trial to another room in the courthouse. (C. 415.) Darby did not object to conducting the trial in that manner, but, in his motion for a new trial, he raised the following claim:

"The trial court erred by confining spectators to a video viewing room to watch the trial by video but turning off the video feed each time there was an objection, argument, or controversial issue raised thus violating [Darby's] right to a public trial.

"This issue was not known to [Darby] until the conclusion of the trial. Therefore, no objection could be raised at the time."

(C. 278.) In support of that claim, Darby submitted an affidavit from Sydney Martin, which states:

"1.    On May 4, 5, and 6, 2021, I observed the majority of [Darby's] trial as an assigned duty of my job for the City of Huntsville. I watched the trial by livestream video in the Madison County Courthouse in a viewing room set up by the court. I was not permitted to sit inside the courtroom. The trial was shown on a computer screen. It is my understanding that the video feed was controlled by [the judge] from the bench.

"2.    On May 4, 2021, during Det. Vogel's testimony, parts of the court video feed were inaudible and could not be heard. Det. Vogel was shown a video recording from his interview with Darby, taken in the days following the incident. Answers to some of the questions were inaudible to those listening to the court video feed.

"3.    On May 4, 2021, the court video feed was turned off after Det. Vogel's testimony when the State rested. Before it was turned off, I heard [the judge] say the attorneys would discuss the remaining witnesses and jury charges. The court video feed never resumed, and it wasn't clear what happened in the courtroom.

"4. On May 5, 2021, Cpt. McCarver testified. Following his testimony, police officer Jason Moore was called to the stand. However, a break was called before Officer Moore testified. It was unclear whether there were any objections. After the lunch break, Officer Moore did not return to the stand, and it was unclear why he didn't testify.

"5. On May 5, 2021, … a man was called to the witness stand. The court video feed in the viewing room indicated David Fail would testify. One of the defense attorneys asked Fail a question about several conversations he had with Parker. The prosecution objected. The judge turned off the court video feed during the objection and it was unclear what happened. When the court video feed resumed, a different witness was on the stand testifying. It wasn't clear who the man was or what he had previously said before being released. The court video feed only showed the final few questions to the witness, which pertained to Parker's tattoos.

"6. On May 6, 2021, [the State's] closing argument was hard to hear. Parts of [defense counsel's] closing argument were also inaudible."

(C. 282-83.) The trial court denied Darby's motion for a new trial, without stating its reasons for doing so.

On appeal, Darby concedes that "sequestration of the spectators in a separate viewing room with livestream video and audio" was "not problematic" and "allowed the trial to remain a public proceeding." (Darby's brief, p. 22.) Darby argues, however, that, when the trial court

33

"turned off the livestream video and audio of the trial at various times," it excluded the public from "key segments of the trial proceedings" and, in doing so, violated his right to a public trial. (Id.) Darby does not point to any instances in which the trial court "turned off the livestream video and audio," other than those instances set forth in Martin's affidavit. Thus, I presume those were the only instances in which the public was excluded from Darby's trial.[3]

Both the United States Constitution and the Alabama Constitution guarantee a criminal defendant the right to a public trial. See U.S. Const., Amend VI. ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."); and Ala. Const., Art. I, § 6 (providing that, "in all criminal prosecutions, the accused has a right to … a speedy, public trial"). This right "serves important interests," Gaston v. State, 265 So. 3d 387, 432 (Ala. Crim. App. 2018), not the least of which is ensuring, "for the benefit of the accused[,] that the public may see he is fairly dealt with and not unjustly condemned," Waller v.

---

[3]Darby does point to another document he submitted with his motion for a new trial, which was a copy of social-media messages indicating that the trial court had "turned off the [audiovisual] feed" during part of the trial. (C. 284.) However, those messages refer to one of the same instances discussed in Martin's affidavit.

Georgia, 467 U.S. 39, 46 (1984) (citations omitted), i.e., "that the procedures employed are fair." Rovinsky v. McKaskle, 722 F.2d 197, 202 (5th Cir. 1984). A public trial also "ensures that the judge, prosecutor, and jury carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury," Ex parte Easterwood, 980 So. 2d 367, 372 (2007) (citing Waller, supra), and it "let[s] the citizenry weigh [the defendant's] guilt or innocence for itself, whatever the jury verdict." Rovinsky, 722 F.2d at 201-02. In short, a public trial "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." In re Oliver, 333 U.S. 257, 270 (1948). See also Weaver v. Massachusetts, 582 U.S. ___, ___, 137 S. Ct. 1899, 1910 (2017) (noting that a public trial "protect[s] the defendant against unjust conviction").

However, even with these important interests at stake, the right to a public trial is not absolute, and, thus, not every courtroom closure will violate that right. Gaston, 265 So. 3d at 432. Some closures may be justified by competing interests, Waller, 467 U.S. at 45, and some closures may occur during a part of the proceedings to which the public-trial right does not attach at all. See United States v. Edwards, 303 F.3d

606, 616 (5th Cir. 2002) (recognizing that the right to a public trial does not attach to every part of a trial); United States v. Ivester, 316 F.3d 955, 959 (9th Cir. 2003) ("Though some courts and treatises boldly declare that the Sixth Amendment right to a public trial applies to the entire trial, this position has been rejected by recent decisions which demonstrate that the right to a public trial does not extend to every moment of trial." (internal citations omitted)); State v. Love, 183 Wash. 2d 598, 605, 354 P.3d 841, 844 (2015) (noting that the first step in addressing a public-trial claim is to "ask if the public trial right attaches to the proceeding at issue"); State v. Smith, 876 N.W.2d 310, 329 (Minn. 2016) (noting that some "nonpublic proceedings simply may not implicate the Sixth Amendment right to a public trial, depending on the nature of the proceeding"); and State v. Reed, 302 Kan. 227, 239, 352 P.3d 530, 540 (2015) (noting that "this case ultimately turns on whether [the defendant's] Sixth Amendment right to a public trial attached to the [proceeding in] question" and holding that it did not).

In addition, some courtroom closures, even if unjustified, may be so trivial that they do not amount to a constitutional violation. As the United States Court of Appeals for the Third Circuit has explained:

> "An unjustified courtroom closure only infringes a defendant's Sixth Amendment rights if it undermines the values the Supreme Court identified in Waller v. Georgia, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984)[,] as fundamental to the public trial guarantee. If the closure did not jeopardize or subvert these values, which (1) ensure a fair trial, (2) remind the government and judge of their responsibility to the accused and importance of their functions, (3) encourage witnesses to come forward, and (4) discourage perjury, it did not offend the Sixth Amendment because the closure is considered trivial."

United States v. Patton, 502 F. App'x 139, 141 (3d Cir. 2012) (internal citations omitted) (not selected for publication in the Federal Reporter).

Other federal circuit courts and numerous state courts have also concluded that an unjustified courtroom closure may be too trivial to amount to a constitutional violation. See Gibbons v. Savage, 555 F.3d 112, 121 (2d Cir. 2009) (noting that a temporary courtroom closure can be "too trivial to justify vacating [a] conviction"); United States v. Anderson, 881 F.3d 568, 573 (7th Cir. 2018) ("In assessing whether a closure rises to the level of a Sixth Amendment violation, we consider the extent to which the closure implicates the values underlying the public trial right …. A trivial violation that does not run afoul of those values will not present a Sixth Amendment violation."); United States v. Perry, 479 F.3d 885, 890 (D.C. Cir. 2007) ("[E]ven a problematic courtroom

closing can be 'too trivial to amount to a violation of the [Sixth] Amendment.'" (quoting <u>Peterson v. Williams</u>, 85 F.3d 39, 42 (2d Cir. 1996))); <u>United States v. Izac</u>, 239 F. App'x 1, 3 (4th Cir. 2007) (not selected for publication in the Federal Reporter) ("While a defendant generally has a Sixth Amendment right to a public trial, in certain situations the exclusion of a member of the public can be too trivial to amount to a violation of the Sixth Amendment."); and <u>Bucci v. United States</u>, 662 F.3d 18, 27 n.5 (1st Cir. 2011) (recognizing that a courtroom closure "could be characterized as 'trivial'"). <u>See also</u> <u>State v. Telles</u>, 446 P.3d 1194, 1199 (N.M. Ct. App. 2019) (acknowledging "the uniform line of authority holding that a courtroom closure that is determined to be trivial does not meaningfully infringe upon the values protected by the right to a public trial"); <u>People v. Lujan</u>, 461 P.3d 494, 500 (Colo. 2020); <u>State v. Turcotte</u>, 173 N.H. 401, 411, 239 A.3d 909, 918 (2020); <u>State v. Morales</u>, 932 N.W.2d 106, 113 (N.D. 2019); <u>Jeremias v. State</u>, 124 Nev. 46, 52, 412 P.3d 43, 50 (2018); <u>State v. Jones</u>, 530 S.W.3d 525, 532 (Mo. Ct. App. 2017); <u>Douglas v. State</u>, 511 S.W.3d 852, 854 (Ark. 2017); <u>Smith</u>, 876 N.W.2d at 329; <u>State v. Northcutt</u>, 381 Mont. 81, 88, 358 P.3d 179,

185 (2015); State v. Torres, 844 A.2d 155, 162 (R.I. 2004); and State v. Small, 351 Wis. 2d 46, 56, 839 N.W.2d 160, 165 (2013).

In accord with those courts, I likewise believe a triviality analysis in the context of public-trial claims is prudent and, in fact, necessary. Without it, a defendant would be entitled to automatic reversal of his conviction for any unjustified courtroom closure, "no matter how inconsequential to the ultimate fairness of the trial." State v. Schierman, 192 Wash. 2d 577, 613, 438 P.3d 1063, 1081 (2018). However, as the United States Court of Appeals for the Second Circuit has concluded, it would be "unimaginable" to hold that every unjustified courtroom closure – "no matter how brief or trivial, and no matter how inconsequential the proceedings that occurred during an unjustified closure – would require that a conviction be overturned." Gibbons, 555 F.3d at 120. Even the United States Supreme Court, though never expressly endorsing a triviality analysis, has acknowledged that "an unlawful closure might take place and yet the trial still will be fundamentally fair." Weaver, 582 U.S. at ___, 137 S. Ct. at 1910. See also Williams v. State, [No. PD-0504-20, Sept. 28, 2022] ___ S.W.3d ___, ___ (Tex. Crim. App. 2022) (noting that the United States Supreme Court has "[n]ever rejected the triviality

39

doctrine"). And refusing to adopt this pragmatic approach when reviewing alleged public-trial violations would give rise to serious problems, as the Washington Supreme Court has aptly noted:

> "[A] rule that completely forecloses the possibility of de minimis[, i.e., trivial, public-trial] violations will often force appellate courts to choose between two undesirable outcomes: on one hand, a reversal that is a clear windfall for the defendant and waste of resources for everyone else; on the other, a holding that the public trial right does not attach at all to the proceeding in question. The policy implications of such a rule are troubling: it creates an incentive for appellate courts to find more and more proceedings exempt from Sixth Amendment and [state-law] protections altogether. This is no doubt why there is no jurisdiction we are aware of that has adopted a rule completely rejecting the doctrine of de minimis closures."

Schierman, 192 Wash. 2d at 613-14, 438 P.3d at 1081-82.

To be clear, a triviality analysis is not the equivalent of a harmless-error analysis, which I recognize is not applicable to public-trial claims. See Ex parte Easterwood, 980 So. 2d at 374 (noting that "a violation of one's right to a public trial is a structural error that is … not subject to a harmless-error analysis"). In fact, a triviality analysis "differs greatly from a harmless error analysis." Smith v. Hollins, 448 F.3d 533, 540 (2d Cir. 2006). See also Anderson, 881 F.3d at 573 (recognizing that a "triviality standard differs from a harmless error assessment"). A

harmless-error analysis necessarily begins with a determination that error occurred, at which point the reviewing court will determine whether the error affected the outcome of the trial or otherwise prejudiced the defendant's substantial rights. Belcher v. State, 341 So. 3d 237, 278 (Ala. Crim. App. 2020). A triviality analysis, on the other hand, "considers whether a closure amounted to any error at all," Lujan, 461 P.3d at 500, and, if the closure was in fact trivial, "then no constitutional violation has occurred," which is to say that "there is no need for a harmless error analysis, because there is no error." Williams, ___ S.W.3d at ___.

With these principles in mind, I turn to Darby's claim that the trial court violated his right to a public trial when it "turned off the livestream video and audio of the trial at various times." Before addressing those instances, however, I first note that parts of Martin's affidavit did not indicate that the trial court had "turned off the livestream video and audio of the trial" but, instead, merely indicated that some of Det. Vogel's testimony and some of the closing arguments had been inaudible or "hard to hear." Thus, it appears that the spectators in the "remote viewing" room were able to observe those parts of the trial but that Det. Vogel and

the attorneys were not speaking directly into the microphone or that there was a technical problem with the audio. As one court has observed, this issue "is not unique to trials proceeding under the COVID-19 protocols," and I have not found any case holding "that the failure of counsel or witnesses to speak directly into a microphone," or that a technical problem with courtroom audio, "deprives a criminal defendant of a right to a public trial." United States v. Barrow, No. 20-127, August 13, 2021 (D.D.C. 2021) (not published in Federal Supplement). Indeed, there may be instances in a trial when spectators who are actually in the courtroom are unable to hear parts of the trial for those same reasons, but this unavoidable reality does not mean the defendant was denied a public trial. See United States v. Hwa, No. 18-CR-538, Feb. 11, 2022 (E.D.N.Y. 2022) (not published in Federal Supplement) (noting that "even a seat in the courtroom does not guarantee that there never will be a technical problem" and thus rejecting the defendant's argument that broadcasting the trial to another room in the courthouse was not "an adequate substitute for viewing the proceedings in person" because, the defendant argued, "technical issues" could "ma[k]e the video feed temporarily unavailable"). As to those parts of Martin's affidavit in

which she did indicate that the trial court had "turned off the livestream video and audio of the trial at various times," Martin indicated that this type of courtroom closure occurred on three occasions.[4]

The first closure occurred on the first day of trial when "the court video feed was turned off after … the State rested." During that closure, the trial court released the jury for the day, and the court and the parties' counsel then discussed three issues. First, the State objected to a defense witness's plan to use a visual aid during his testimony. (R. 731-35.) The trial court ruled that the visual aid was inadmissible, and defense counsel did not object to the court's ruling; in fact, defense counsel stated that the court could "just rule on it" and that he would agree to "move forward from there, whatever [the] ruling [wa]s." (R. 732.) Second, the State sought to clarify the scope of a prior evidentiary ruling, and, after the court clarified the ruling, defense counsel conceded that the ruling was correct and stated that he had no intention of eliciting any testimony that would violate the ruling. (R. 735-42.) Finally, there was a brief

---

[4]To be clear, when I refer to the "closures" that occurred in this case, I am referring to those instances in which the trial court "turned off the livestream video and audio of the trial," not the closure of the actual courtroom and the decision to broadcast the trial to a remote public, which Darby has not argued was improper.

discussion regarding jury instructions; specifically, the parties' counsel agreed that the trial court's proposed instructions on the burden of proof were proper, agreed that it would be more efficient to discuss the self-defense instructions after the defense presented its evidence, and informed the court that neither party wanted any lesser-included offenses submitted to the jury. (R. 743-51.)

The second closure occurred on the second day of trial when defense counsel asked defense witness David Fail about some conversations he had had with Parker regarding "how [Parker] felt about the police." (R. 781.) The State objected to the question, at which point the trial court "turned off the court video feed." During a bench conference that occurred outside the presence of the jury, the trial court sustained the State's objection on the basis that the conversations were too remote to provide evidence of Parker's state of mind at the time of his death. (R. 781-83.) The trial court then allowed defense counsel to make an offer of proof to preserve Fail's testimony for the record (R. 783-86), and, following that offer of proof, counsel called Officer Stuart Hartley of the Huntsville Police Department ("HPD") to testify. According to Martin, "the court video feed resumed" at some point during Officer Hartley's

44

testimony; thus, it appears that the trial court inadvertently failed to restart the "video feed" immediately after the bench conference that preceded his testimony. Officer Hartley's testimony was brief, covering only three pages of the transcript (R. 791-93), and the substance of his testimony was that Parker had a tattoo on his chest that was associated with "[w]hite supremacist groups" and "Nazi[s]." (R. 792.) Martin acknowledged that she had heard Officer Hartley's testimony regarding Parker's tattoo, but she claimed that she had not heard "what [Officer Hartley] had previously said." Before testifying about Parker's tattoo, Officer Hartley provided brief introductory information about himself, including that he was the "gang coordinator" for the HPD and that, in that role, he "take[s] information and intelligence from all the other units within the [HPD] and … verif[ies] that information to do gang identification around the city." (R. 791.)

The third and final closure also occurred on the second day of trial. Following Cpt. McCarver's testimony, the defense called Officer Jason Moore of the HPD to testify, at which point the State asked to approach the bench. According to Martin, "a break was called" at that time, and the trial broadcast did not resume until after the lunch recess, when

"Officer Moore did not return to the stand." Thus, Martin noted, it "was unclear whether there were any objections" to Officer Moore's testimony, and "it was unclear why he didn't testify." During the lunch recess, the trial court ruled that Officer Moore would not be allowed to testify regarding an unrelated incident in which he "waited until he saw a furtive movement by [a] suspect before he tried to fire his gun, and because he waited he was shot before he could fire his weapon." (R. 872.) According to the trial court, that unrelated incident was not relevant, and, following the court's ruling, defense counsel made an offer of proof as to Officer Moore's testimony. (R. 871-72.) After the lunch recess, the trial court told the parties' counsel that a juror had informed the court that he had once been "good friends" with a police officer whom he had seen in the courthouse during the recess. (R. 874-75.) Defense counsel noted that he did not think the officer was going to be a witness, but, out of an abundance of caution, the trial court asked the juror if he would give the officer's testimony "any more weight than any other witness" if the officer testified. (R. 875.) The juror indicated that he would not afford the officer's testimony any undue weight, and, regardless, the officer did not testify.

46

In short, what occurred during the three closures were four routine evidentiary rulings (technically three rulings and the clarification of a prior ruling), a brief discussion regarding jury instructions, the beginning of a witness's testimony in which he identified himself as a police officer and explained the nature of his duties, and a brief investigation into a juror's relationship with a police officer who did not testify and who was not involved in the case. I also note that the three closures collectively covered 44 pages of the 825-page trial transcript. Thus, the public was able to observe almost the entire trial, and, as I will explain, I do not believe Darby's right to a public trial was violated by the three brief closures that occurred.

As to the public's exclusion from the evidentiary rulings and the discussion of jury instructions, other courts have held that "[n]on-public exchanges between counsel and the court on such technical legal issues" as "evidentiary rulings" and "jury charges" do not violate a defendant's right to a public trial because they "do not hinder the objectives which … [a]re fostered by public trials." United States v. Norris, 780 F.2d 1207, 1210 (5th Cir. 1986). See Smith, 876 N.W.2d at 330 (noting that "courts have allowed nonpublic proceedings for evidence-related proceedings"

and holding that "an issue of evidentiary boundaries" that occurred in that case did not violate the Sixth Amendment); Reed, 302 Kan. at 242, 352 P.3d at 542 ("[E]videntiary rulings ordinarily pose no threat of judicial, prosecutorial or public abuse that a public trial is designed to protect against." (citation omitted)); State v. Smith, 181 Wash. 2d 508, 518, 334 P.3d 1049, 1055 (2014) (noting that "evidentiary rulings that are the subject of traditional sidebars do not invoke any of the concerns the public trial right is meant to address"); Smith v. Titus, 958 F.3d 687, 693 (8th Cir. 2020) (affirming a state appellate court's ruling that "a trial judge's articulation of an evidentiary ruling" did not violate the defendant's right to a public trial), cert. denied, 592 U.S. ___, 141 S. Ct. 982 (2021); United States v. Vazquez-Botet, 532 F.3d 37, 51-52 (1st Cir. 2008) (noting that there is "no precedent … extending the Sixth Amendment public-trial right to an … offer of proof"); State v. Pendleton, 978 N.W.2d 641, 646 (N.D. 2022) (noting that "routine evidentiary rulings [and] objection rulings … 'generally are not closures implicating the Sixth Amendment'" (quoting State v. Martinez, 956 N.W.2d 772, 785 (N.D. 2021))); Morales, 932 N.W.2d at 113-14 ("Brief sidebars or bench conferences ordinarily will not implicate the public trial right where they

48

are conducted during trial to address routine evidentiary or administrative issues outside the hearing of the jury. For example, arguments and rulings on objections and other routine evidentiary matters that must be held outside the jury's hearing need not be conducted so that the public can hear."); United States v. Vaghari, 500 F. App'x 139, 150 (3d Cir. 2012) (not selected for publication in the Federal Reporter) ("[T]he public … may be justifiably excluded from sidebar and chambers conferences even when substantive rulings are made." (citation omitted)); State v. Koss, 181 Wash. 2d 493, 501, 334 P.3d 1042, 1046 (2014) (holding that "in-chambers discussion of jury instructions did not violate the constitutional right to a public trial"); State v. Miller, 179 Wash. App. 91, 103, 316 P.3d 1143, 1150 (2014) (holding that "the trial court's in-chambers conference to discuss jury instructions … [did] not constitute a closure"); and State v. Reeves, 268 A.3d 281, 291 (Me. 2022) (noting that, during bench conferences and court recesses, "the court may hear from the parties outside the sight and hearing of the public").

I likewise believe that no constitutional violation occurred in Darby's trial when the public was excluded from four routine, mid-trial evidentiary rulings and a brief discussion of jury instructions, all of which

49

occurred outside the presence of the jury.[5] Furthermore, even if such proceedings should typically be open to the public, I am confident that the public's exclusion from them was trivial in this case. That confidence stems from the facts that there were no disputed issues during two of the evidentiary rulings or during the discussion of jury instructions and that Darby has not argued on appeal that the other two evidentiary rulings were incorrect. As noted, the primary purpose of a public trial is to protect the defendant from an unjust conviction, Weaver, supra, and it is difficult for me to see how this safeguard was undermined when Darby has never alleged that anything erroneous or untoward occurred during those proceedings. See Gibbons, 555 F.3d at 121 (noting, in holding that

---

[5]Excluding the public from a hearing on a motion to suppress, which is conducted for the purpose of issuing an evidentiary ruling, will violate the defendant's right to a public trial absent competing interests that justify the exclusion. Waller, 467 U.S. at 47. However, there was no closure of a suppression hearing in this case, and a suppression hearing differs from routine evidentiary rulings that occur during trial in that "a suppression hearing often resembles a bench trial" where "witnesses are sworn and testify" and where the ruling "frequently depends on a resolution of factual matters." Id. A suppression hearing also "commonly determine[s] the outcome of the prosecution" and "involve[s] an attack on the police and prosecutors," which means that it is "vital" for the public to observe such hearings to "discourag[e] perjury and assur[e] that the government comports itself responsibly." Edwards, 303 F.3d at 616. See Norris, 780 F.2d at 1210 (noting the distinction between suppression hearings and "routine evidentiary ruling[s]" that occur during trial).

a courtroom closure was trivial, that the defendant had raised "no objections … to anything that occurred" during the closure); Jones, 530 S.W.3d at 532 (noting, in holding that a courtroom closure was trivial, that there was "'no suggestion of misbehavior by the prosecutor, judge, or any other party'" and "'no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands'" (quoting Weaver, 582 U.S. at ___, 137 S. Ct. at 1913)); and Reed, 302 Kan. at 243, 352 P.3d at 542 (noting, in holding that a courtroom closure did not violate the Sixth Amendment, that "there were no allegations of government misconduct that required circulation in the fresh air that accompanies public observation").

As to the public's exclusion from part of Officer Hartley's testimony, closing the courtroom during trial testimony can certainly violate the defendant's right to a public trial in some instances. See, e.g. Demouey v. State, 202 So. 3d 355 (Ala. Crim. App. 2015) (holding that there was a public-trial violation when the trial court closed the courtroom during the victim's testimony). In this case, however, the only part of Officer Hartley's testimony from which the public was excluded was his introduction of himself and his explanation of his duties with the HPD.

51

The public's exclusion from that brief and insignificant testimony does not give me even the faintest concern that Darby was not tried fairly, and, thus, I have no trouble concluding that the exclusion was trivial. See Peterson v. Williams, 85 F.3d 39, 43 (2d Cir. 1996) (holding that a courtroom closure was trivial, even though it had occurred during the defendant's testimony, because the public had not "missed much of importance as a result of the accidental closure"); Brown v. Kuhlmann, 142 F.3d 529, 541 (2d Cir. 1998) (holding that a courtroom closure was trivial, even though it had occurred during brief trial testimony, because the testimony concerned a "collateral issue"); and Gibbons, 555 F.3d at 121 (holding that a courtroom closure was trivial because "nothing of significance happened" during the closure).

Finally, as to the public's exclusion from the trial court's mid-trial questioning of a juror, several courts have determined that the right to a public trial does not attach to such mid-trial investigations, see Ivester, 316 F.3d at 959; Morales, 932 N.W.2d at 119; and State v. Halverson, 176 Wash. App. 972, 977-78, 309 P.3d 795, 797-98 (2013), and at least one other court has questioned whether it does, see United States v. Brown, 669 F.3d 10, 33 (1st Cir. 2012). Regardless, even if such investigations

must generally be open to the public, the mid-trial investigation that occurred in this case was, in my opinion, clearly trivial. As noted, the trial court briefly investigated a juror's report that he had once been "good friends" with a police officer whom he had seen in the courthouse during a recess – a fact that could have resulted in the juror's bias toward the State if the officer had testified or had been involved in the case. However, because the officer did not testify and was not involved in the case, the potential bias never materialized. Thus, nothing that occurred during that investigation even remotely raises questions in my mind as to whether Darby was "fairly dealt with and not unjustly condemned." Waller, 467 U.S. at 46 (citations omitted). Therefore, I have no trouble concluding that the public's exclusion from that brief and inconsequential investigation was also trivial. See Brown, 669 F.3d at 33 ("We need not determine whether the public trial right could ever extend in such circumstances, but simply 'decline to recognize such a right on facts as uncompelling as these.'" (quoting Vazquez-Botet, 532 F.3d at 52)); and Gibbons, 555 F.3d at 121 (holding that a courtroom closure was trivial because "nothing of significance happened" during the closure).

In sum, the great bulk of Darby's trial was accessible to the public, and those parts that were not accessible involved (1) routine evidentiary rulings that either were not disputed at trial or have not been disputed on appeal, (2) a brief discussion of jury instructions that also involved no disputed issues, (3) brief and insignificant testimony from one witness, and (4) a brief investigation into a potential juror conflict that never materialized.  The fact that the public was excluded from those parts of the trial "hardly turned [the trial] into an 'instrument[ ] of persecution'" that a public trial is intended to prevent, Brown, 142 F.3d at 541 (quoting In re Oliver, 333 U.S. at 270), and the public was able to see that Darby was tried and convicted fairly despite those brief closures.  Indeed, I am wholly convinced that there would be no additional assurance that Darby received a fair trial had those closures not occurred.  Thus, given the specific facts of this case, I would hold that Darby's right to a public trial was not violated.

None of this is to say that I condone the brief closures that occurred in Darby's trial, and I caution trial courts that "'the exclusion of any spectator runs the risk of violating the Sixth Amendment, and, accordingly, of requiring a new trial.'"  Jones, 530 S.W. 3d at 532 n.3

(quoting <u>Braun v. Powell</u>, 277 F.3d 908, 920 (7th Cir. 2000)).  Thus, in cases where the trial court provides a live broadcast of the trial to a remote public, the best practice is for the court to allow the broadcast to continue uninterrupted while the trial is in session.  However, "on the narrow facts presented here, [I am] convinced that any effect of the … 'closure[s]' on [Darby's] trial did not rise to the level of a Sixth Amendment violation," <u>Jones</u>, 530 S.W. 3d at 532 n.3, because, to my mind, there would be no further assurance that Darby received a fair trial if those closures had not occurred.  As the Washington Supreme Court has noted, appellate courts "must … avoid enforcing the public trial right in a manner so rigid and mechanistic that [they] do more harm than good." <u>Schierman</u>, 192 Wash. 2d at 613, 438 P.3d at 1081. <u>See also</u> <u>Hunt v. State</u>, 842 So. 2d 999, 1039 (Ala. Crim. App. 1993) ("To grant [the defendant] a new trial under these circumstances [(the closure of certain pre-trial proceedings)] would 'be a windfall for [him], and not in the public interest.'" (quoting <u>Waller</u>, 467 U.S. at 50)).

One final point warrants mention before I address Darby's other requested jury instructions.  In arguing that the trial court violated his right to a public trial, Darby makes much of the fact that the court

"turned off the livestream video and audio of the trial" without conducting what has been referred to as "the <u>Waller</u> test." <u>Demouey</u>, 202 So. 3d at 358. That test provides that a trial court may close criminal proceedings to the public if the court (1) determines that doing so will "'advance an overriding interest that is likely to be prejudiced,'" (2) ensures that the closure is "'no broader than necessary to protect that interest,'" (3) "'consider[s] reasonable alternatives to closing the proceedings,'" and (4) "'make[s] findings adequate to support the closure.'" <u>Ex parte Easterwood</u>, 980 So. 2d at 373 (quoting <u>Waller</u>, 467 U.S. at 48).

However, a trial court is required to satisfy the <u>Waller</u> test only when the closure would otherwise amount to a constitutional violation. For example, the closure in <u>Waller</u> occurred during a suppression hearing, which typically must be open to the public. <u>See</u> note 3, <u>supra</u>. In <u>Ex parte Easterwood</u>, <u>supra</u>, and <u>Demouey</u>, <u>supra</u>, which both relied on <u>Waller</u>, the closures occurred during a witness's testimony, which also typically must be open to the public. Thus, the <u>Waller</u> test was required in those cases because the closures <u>amounted to constitutional violations</u> unless the test was satisfied. But when a courtroom closure does <u>not</u>

amount to a constitutional violation in the first place, as is the case with the trivial closures that occurred here, the <u>Waller</u> test is unnecessary. See <u>State v. Brown</u>, 815 N.W.2d 609, 617 (Minn. 2012) ("[T]he closure in question was so trivial that it did not implicate Lindsey's right to a public trial, thereby eliminating any need to conduct a <u>Waller</u> analysis."); <u>Ivester</u>, 316 F.3d at 958 ("Before applying the <u>Waller</u> test …, we must first determine whether the right [to a public trial] attaches to [the proceeding in question].");  <u>Perry</u>, 479 F.3d at 889-90 ("The <u>Waller</u> test applies … only if closing the courtroom implicates the defendant's Sixth Amendment right."); <u>Williams</u>, ___ S.W.3d at ___ (holding that the Court was not "bound to adhere to the 'strict' dictates of <u>Waller</u>" because the triviality doctrine was applicable); <u>Turcotte</u>, 173 N.H. at 410, 239 A.3d at 917 (noting that the <u>Waller</u> test applies only if the closure implicates the Sixth Amendment); <u>United States v. Gupta</u>, 699 F.3d 682, 689 (2d Cir. 2012) ("<u>Absent the triviality exception</u>, reversal is required here because the district court failed to make <u>Waller</u> findings before excluding the public from the courtroom." (emphasis added)); <u>Zornes v. Bolin</u>, 37 F.4th 1411, 1417 (8th Cir. 2022) (rejecting the petitioner's claim that "a conclusion of triviality cannot be reconciled with <u>Waller</u>'s demand that

the court must identify an overriding interest for closure and consider reasonable alternatives"); State v. Decker, 907 N.W.2d 378, 385 (N.D. 2018) (holding that a courtroom closure did not violate the Sixth Amendment, even though the closure had been "made without proper Waller findings," because the closure was trivial); Bowden v. Keane, 237 F.3d 125, 129 (2d Cir. 2001) (noting that the Waller test must be satisfied for "non-trivial courtroom closures" (emphasis added)); and People v. Turner, 519 P.3d 353, 361 (Colo. 2022) (holding that a non-trivial courtroom closure "implicated the Waller test").

## II. Darby's Other Requested Jury Instructions

In addition to arguing that the trial court erred by refusing to give requested instruction no. 35 – the claim that the Court holds entitles Darby to relief – Darby also argued that the trial court erred by refusing to give requested instruction no. 33 and requested instruction no. 34. I find no merit to those claims.

### A. Requested Instruction No. 33

Requested instruction no. 33 stated:

> "Where police orders to drop a gun have gone unheeded, an officer is not required to wait until an armed suspect has drawn a bead on, or point[ed] the gun, at the officers or others before using deadly force."

(C. 210.) According to Darby, the omission of that instruction prejudiced his defense because, he says, it "prevent[ed] the jury from hearing that [he] could be justified in using deadly physical force even if Parker didn't point the gun at [him] or another officer." (Darby's brief, p. 47.)

However, although the trial court did not give requested instruction no. 33, it did instruct the jury as follows:

> "The rule of self-defense is that persons may and must act on the reasonable appearance of things. It is not required that where a person is menaced he just wait until a weapon is presented ready for deadly execution."

(R. 1089.) That instruction clearly informed the jury that Darby's use of deadly force might have been justified even though Parker never pointed his weapon at the officers, and it is well settled that a trial court does not commit reversible error by refusing to give a requested jury instruction if that instruction is "'"substantially covered by the [trial] court's charge."'" Johnson v. State, 168 So. 3d 163, 167 (Ala. Crim. App. 2014) (quoting Ex parte R.D.W., 773 So. 2d 426, 429 (Ala. 2000), quoting in turn Dill v. State, 600 So. 2d 343, 353 (Ala. Crim. App. 1991)). Thus, I would not hold the trial court in error for refusing to give requested instruction no. 33. See Perryman v. State, 558 So. 2d 972, 979 (Ala. Crim. App. 1989)

(holding that the trial court's refusal to give the defendant's requested instruction was not error because the court's jury charge "'substantially and fairly'" covered the instruction, "though not by identical language" (quoting § 12-16-13, Ala. Code 1975)).

## B. Requested Instruction No. 34

Requested instruction no. 34 stated:

> "Escalation into deadly force is justified by a person's refusal to comply with officers' commands to drop his gun if the officers reasonable [sic] reacted to what they perceived as an imminent threat to themselves. An officer's use of deadly force must be objectively reasonable given the circumstances of a tense, uncertain, and rapidly evolving crisis."

(C. 210.) As Darby notes, a crucial question of fact in this case was whether he reasonably believed he was facing the imminent use of deadly force when he shot Parker, and he argues that "[n]o other instruction discussed how the jury could consider Parker's noncompliance with lawful orders" when making that determination. (Darby's brief, p. 49.)

The only authority Darby cites for this instruction is Montoute v. Carr, 114 F.3d 181 (11th Cir. 1997), in which the defendant police officer was alleged to have used excessive force in violation of 42 U.S.C. § 1983 when he shot a suspect in order to apprehend him. In holding that the police officer was entitled to qualified immunity, the United States Court

60

of Appeals for the Eleventh Circuit concluded that, given the facts of the encounter, the officer could have reasonably believed that the suspect might fire his shotgun at the officer or someone else. The Court then went on to state that the suspect's "unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided an additional basis for inferring that he presented a risk of serious physical injury to an officer or someone else." Montoute, 114 F.3d at 185.

Montoute provides support for the conclusion that Parker's noncompliance was a fact for the jury to consider in determining whether Darby was facing the imminent use of deadly force when he shot Parker. However, Montoute does not hold that Parker's noncompliance represented the imminent use of deadly force as a matter of law, and the State's evidence supported a finding that Darby was not facing the imminent use of deadly force, despite Parker's noncompliance. In other words, whether Darby was facing the imminent use of deadly force was a disputed issue of fact, and requested instruction no. 34 focused on only evidence that was favorable to Darby on that issue and thus tended to frame that disputed issue in a light favorable to him. As this Court has previously stated: "Under Alabama law, judges cannot comment on the

evidence," and "a one-sided summary of the evidence by the trial court is a forbidden comment on the evidence." Riley v. State, 875 So. 2d 352, 358 (Ala. Crim. App. 2003). See also Cameron v. State, 615 So. 2d 121, 124 (Ala. Crim. App. 1992) ("It is well-settled that 'the instructions of the court in a criminal prosecution must not invade the province of the jury.'" (quoting 23A C.J.S. Criminal Law § 1293 at 198 (1989))). Thus, because requested instruction no. 34 would have served as an improper comment on the evidence, I would not hold the trial court in error for refusing to give that instruction. See Ex parte Brown, 581 So. 2d 436, 437 (Ala. 1991) (holding that the trial court's instruction was improper because the court's "summary of only the State's evidence amounted to a factual determination" and "could reasonably have been taken to advocate the State's version of the evidence"); and Cameron, 615 So. 2d at 126 (holding that the trial court's instruction entitled the defendant to a new trial because the instruction "tended to bolster" the State's evidence and "to disparage the defense theory of the case").